# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-DP-00619-SCT

*GERRY LYNN LESTER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/01/93 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | LESLIE L. LEE |
| DISTRICT ATTORNEY: | PETERS, EDWARD J., |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | REVERSED AND REMANDED - 4/10/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/1/97 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. During its January 1992 term, the Hinds County Grand Jury indicted Gerry Lynn Lester for the capital murder of his one-year-old daughter Shadai Sanders in the course of felonious child abuse on or about September 29, 1991, in violation of Miss. Code Ann. § 97-3-19(2)(f). Lester's trial began on February 16, 1993, and on February 18, the court granted the prosecution's motion to amend the indictment to include abuse during the time period between June 19, 1991 and September 29, 1991. The jury returned a verdict of guilty on the charge of capital murder on February 26. The sentencing phase of the trial was held on March 1, 1993, and the jury voted that the death penalty should be imposed. On March 1, 1993, Circuit Judge William F. Coleman ordered that Lester be put to death by lethal injection on April 12, 1993. Lester filed his motion for a new trial or for J.N.O.V. or for resentencing on March 25, 1993, which was denied by Judge Coleman on May 7, 1993. Aggrieved with the jury's verdict and sentence, Lester filed his appeal to this Court assigning thirty-five separate

errors for our review. Because we find reversible error in Issues II, IV, VII, and X, and in subparts E, F, and G of Issue VI, the conviction of capital murder and sentence of death by lethal injection must be reversed, and the case must be remanded for a new trial.

**I. THE TRIAL COURT ERRED IN OVERRULING LESTER'S OBJECTIONS TO VOIR DIRE QUESTIONS BY THE PROSECUTOR WHICH WERE HYPOTHETICAL, DESIGNED TO CONFUSE AND MISLEAD THE JURY OR TO COMMIT THEM TO A VERDICT PRIOR TO TRIAL.**

**II. LESTER'S CASE MUST BE REVERSED BECAUSE THE TRIAL JUDGE ERRONEOUSLY ALLOWED THE PROSECUTOR TO AMEND THE INDICTMENT.**

**III. THE TRIAL JUDGE ERRED IN ALLOWING THE PROSECUTORS TO ELICIT IMPROPER OPINIONS FROM EXPERT WITNESSES.**

**IV. LESTER WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY THE TRIAL JUDGE'S DENIAL OF HIS REQUEST FOR CONTINUANCE FOR ADEQUATE TIME TO PREPARE.**

**V. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF LESTER'S POST ARREST SILENCE.**

**VI. THE CUMULATIVE EFFECT OF THE INTRODUCTION OF OTHER OFFENSE AND BAD ACTS EVIDENCE AND THE PROSECUTION'S IMPROPER SUGGESTION THAT THE JURY SHOULD USE THE EVIDENCE TO CONVICT THE DEFENDANT BECAUSE OF HIS BAD CHARACTER CALLS FOR REVERSAL OF BOTH THE GUILT AND PENALTY PHASES OF LESTER'S TRIAL.**

**VII. THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S OBJECTION TO TESTIMONY FROM RUCHELLE SANDERS, THE VICTIM'S MOTHER, ABOUT GERRY LESTER'S ALLEGED ASSAULTS ON RUCHELLE WHILE SHE WAS PREGNANT.**

**VIII. THE COURT ERRED IN ADMITTING HEARSAY EVIDENCE.**

**IX. THE COURT ERRED IN ADMITTING INADMISSIBLE OPINION EVIDENCE.**

**X. THE CUMULATIVE EFFECT OF IRRELEVANT PREJUDICIAL EVIDENCE WARRANTS REVERSAL.**

**XI. THE TRIAL COURT ERRED IN NOT ADMITTING THE FULL TEXT OF EXHIBITS E AND F, LETTERS FROM LESTER TO SANDERS.**

**XII. THE PROSECUTION'S DELIBERATE FAILURE TO PROVIDE DISCOVERY WARRANTS REVERSAL.**

**XIII. THE TRIAL COURT ERRED IN OVERRULING LESTER'S OBJECTION TO THE PROSECUTOR'S UNSWORN TESTIMONY THAT HIS OFFICE HAD NOT DENIED LESTER A POLYGRAPH.**

**XIV. THE TRIAL COURT ERRED IN DENYING INSTRUCTION NUMBER D-9 WHICH EMBODIED A THEORY OF DEFENSE.**

**XV. THE OVERLAP BETWEEN SECTION 97-3-19(2)(f) AND 97-3-27 GIVES PROSECUTORS AND JURIES UNFETTERED DISCRETION TO IMPOSE EITHER THE DEATH PENALTY OR CONVICT OF MANSLAUGHTER AND VIOLATES THE EIGHTH AMENDMENT AND CORRESPONDING SECTIONS OF THE MISSISSIPPI CONSTITUTION.**

**XVI. THE INSTRUCTIONS FAIL TO ADEQUATELY INFORM THE JURY OF ITS OPTIONS TO FIND MANSLAUGHTER.**

**XVII. THE JUDGE COMMITTED REVERSIBLE ERROR IN OVERRULING LESTER'S OBJECTION TO THE JURY INSTRUCTION WHICH OMITTED INTENT FROM THE ELEMENTS OF THE CHARGE ON CHILD ABUSE.**

**XVIII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO GIVE THE INSTRUCTION REQUESTED BY THE DEFENSE DEFINING CHILD ABUSE AND CHILD NEGLECT.**

**XIX. THE TRIAL COURT ERRED IN OVERRULING LESTER'S CHALLENGES FOR CAUSE TO SEVERAL JURORS.**

**XX. THE TRIAL COURT ERRED IN SUSTAINING THE PROSECUTION'S CAUSE CHALLENGE TO JUROR NIMOX.**

**XXI. THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE TO JUROR HENRY GREENE.**

**XXII. THIS CASE MUST BE REVERSED OR REMANDED BECAUSE THE JUDGE DID NOT REQUIRE THE PROSECUTOR TO GIVE REASONS FOR HIS PEREMPTORY CHALLENGES.**

**XXIII. ADDITIONAL PROSECUTORIAL MISCONDUCT DEPRIVED LESTER OF DUE PROCESS AND A FAIR TRIAL.**

**XXIV. THE VERDICT OF GUILT IS SUPPORTED BY INSUFFICIENT CREDIBLE EVIDENCE.**

**XXV. THE PROSECUTION COMMITTED REVERSIBLE ERROR AT SENTENCING BY COMMENTING ON LESTER'S FAILURE TO TESTIFY.**

**XXVI. INSTRUCTIONS DEFINING "HEINOUS, ATROCIOUS OR CRUEL" WERE UNCONSTITUTIONALLY VAGUE.**

**XXVII. THE HAC AGGRAVATOR IS ALSO UNCONSTITUTIONAL AS APPLIED TO LESTER.**

**XXVIII. THE TRIAL COURT'S ANTI-SYMPATHY INSTRUCTION COUPLED WITH THE DENIAL OF A MERCY INSTRUCTION MEAN THAT LESTER'S SENTENCE MUST BE REVERSED.**

**XXIX. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT LESTER WAS REQUIRED TO PROVE THAT THE MITIGATING CIRCUMSTANCES OUTWEIGHED THE AGGRAVATING IN ORDER TO RECEIVE A LIFE SENTENCE.**

**XXX. THE COURT ERRED IN GIVING INSTRUCTION SS-1.**

**XXXI. THE TRIAL COURT ERRED IN DENYING LESTER'S REQUEST FOR AN INSTRUCTION ON THE STATUTORY MITIGATING FACTOR OF EXTREME MENTAL OR EMOTIONAL DISTURBANCE.**

**XXXII. THE TRIAL COURT SIMILARLY ERRED IN DENYING LESTER'S REQUEST TO INSTRUCT THAT THE JURY COULD CONSIDER HIS LACK OF SIGNIFICANT CRIMINAL HISTORY AS MITIGATION.**

**XXXIII. THE TRIAL JUDGE ERRED IN GIVING INSTRUCTION S-5 OVER LESTER'S OBJECTION.**

**XXXIV. THE TRIAL COURT ERRED IN GIVING INSTRUCTION S-3 WHICH ALLOWED THE JURY TO CONSIDER NON-STATUTORY AGGRAVATING CIRCUMSTANCES.**

**XXXV. THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE.**

## STATEMENT OF THE FACTS

¶2. Shadai Sanders was born on September 30, 1990 to her parents, Ruchelle Sanders and Gerry Lester. Ruchelle and Gerry lived together with Shadai and her then six-year-old half brother Kendrick Sanders in a low-income apartment on Martin Luther King Drive that Ruchelle obtained by application. Ruchelle worked at the Interstate Chevron Station on Northside Drive, and since Gerry was unemployed, he stayed at home with the children. Gerry's sister, Brenda, and Gerry's mother, Annie, sometimes took care of Shadai and Kendrick.

¶3. When Shadai was approximately eight months old, her lip became cut, bruised, and swollen while Ruchelle was at work and Gerry was taking care of her. Ruchelle asked Gerry how Shadai's lip was injured, and Gerry told her that Shadai had fallen. Gerry told Michelle Martin, Ruchelle's friend and co-worker, that Shadai hurt her lip falling out of bed, but Michelle didn't believe him. Michelle told Ruchelle that she thought Gerry was lying and that Ruchelle should get her baby away from Gerry.

¶4. On June 19, 1991, about two or three weeks after Shadai's lip was injured, Gerry called Ruchelle at work and told her that Shadai's leg was broken and that he was taking her to the University of Mississippi Medical Center (UMMC). Dr. Joel Donaldson treated Shadai for a spiral fracture in her femur. Gerry initially gave Dr. Donaldson no explanation for the cause of injury, but later upon questioning Gerry told the doctor that Shadai had caught her leg in the couch. Dr. Donaldson

testified at trial that the most likely cause of a spiral fracture in the femur of a child that age is child abuse. This conclusion that the leg break was likely caused by child abuse was supported by the testimony at trial of Dr. Bonnie Woodall, who subsequently treated Shadai on the night of her death, and Dr. Bernard Blumenthal, the pediatric radiologist who analyzed Shadai's x-rays. Defense witness Dr. Steven Timothy Hayne also testified that a spiral fracture suggests child abuse, but is not in and of itself conclusive of abuse. However, based upon all of his knowledge of the case, Dr. Hayne concluded that Shadai's spiral fracture was caused by child abuse.

¶5. Dr. Donaldson and Dr. Blumenthal also agreed that the spiral fracture was inconsistent with Gerry's explanation that Shadai caught her leg in the couch. However, Dr. Hayne testified that Shadai's leg could have been broken in a spiral fracture if her leg were caught in a fixed position and Gerry pulled and twisted her out of the couch. Kendrick testified that on the day that Shadai's leg was broken he came inside from playing and Shadai's leg was stuck in the couch.

¶6. After treating Shadai for the spiral fracture, Dr. Donaldson contacted the Department of Human Services (DHS) to report his suspicion of child abuse per the hospital routine and Mississippi law in suspected abuse cases. At the hospital Ruchelle talked to Wanda Gillom, a social worker with DHS. Ms. Gillom came to Ruchelle's apartment the next day to speak with Gerry. Ruchelle told Ms. Gillom that she had never seen Gerry abuse Kendrick or Shadai, but she did tell her that after the broken leg, Shadai always cried when left with Gerry. Ms. Gillom instructed Gerry to attend classes on child care, but Gerry never went. Ms. Gillom never came back, never called to check up on Ruchelle and Gerry, and never followed up on her instructions for Gerry to attend the child care classes.

¶7. On September 29, 1991, Ruchelle got up at about 9:00 a.m. She fed and dressed Shadai, and woke Gerry up at about 11:00. Then Ruchelle, Gerry, Shadai, and Gerry's brother, Eddie, all went shopping together. Testimony differed as to whether Kendrick went along on the shopping trip. Testimony also differed as to whether the group stopped by Ruchelle's workplace before going shopping. During the shopping trip, Ruchelle would take Shadai into the stores with her and leave Gerry and Eddie in the car.

¶8. After they finished shopping, they stopped by Ruchelle's workplace, so that Ruchelle could visit with her friend and co-worker Michelle Martin. Ruchelle testified that Shadai was fine at this point; she noticed no signs of grogginess or discomfort. While she was visiting with Michelle, Ruchelle bought Gerry and Eddie a six-pack of beer.

¶9. Gerry, Eddie, and Shadai were going to Brenda's house for dinner. Ruchelle had to be at work by 6:00 p.m., so they went by Brenda's to pick up Kendrick. Then they took Ruchelle by her apartment to eat and change for work and dropped her off at the Chevron. This was the last time that Ruchelle saw Shadai alive, and Ruchelle testified that Shadai was fine at this point--laughing and playing, with no signs of grogginess.

¶10. Gerry, Eddie, Kendrick, and Shadai all went to Brenda's for supper. Ruchelle had called Brenda and asked her to have Gerry call her at work when he got to Brenda's, because she was worried about Gerry driving after drinking beer. Gerry called Ruchelle at about 6:20 to check in with her; then Gerry, Shadai, and Kendrick ate dinner. Kendrick testified that he and Shadai had eaten the same food and that Shadai had fed herself with a spoon. Brenda, Gerry, and Brenda's fiancé, Carl Jacobs, all testified that Shadai wouldn't eat when Brenda and Gerry tried to feed her, but the autopsy

report showed that Shadai's stomach contained peas, beans, and mashed potatoes.

¶11. Gerry, Kendrick, and Shadai went back to their apartment after eating and visiting, sometime before 8:00. Eddie came over to the apartment about fifteen minutes after they arrived. At about the same time, Shadai became violently ill, so Gerry, Eddie and Kendrick took Shadai to UMMC. Gerry called Ruchelle from the hospital at about 8:30 and told her that he'd taken Shadai to the hospital. Gerry came to pick up Ruchelle and told her that Shadai had been throwing up, but that he didn't know what was wrong with her. When Ruchelle got to the hospital, the doctor called her into a conference room and told her that Shadai was dead.

¶12. Dr. Woodall testified that Shadai had no vital signs when she arrived at the hospital. After resuscitation efforts failed, Shadai was pronounced dead at 9:00 p.m. There were bruises on Shadai's abdomen and back caused by multiple blows, she had multiple head injuries, and her inferior vena cava had been ruptured. The cause of Shadai's death was interior bleeding from the ruptured vena cava, but Dr. Galvez testified that Shadai would have died as a result of the head injuries had she not bled to death. The experts' testimony showed that Shadai would have died within two to three hours after her vena cava was ruptured, possibly in as little as thirty minutes. The experts also agreed that Shadai would not have eaten after sustaining the abdominal and head injuries. Shadai's autopsy also revealed that her anal and vaginal openings were enlarged from previous multiple penetrations, but these wounds were healed. Dr. Hayne testified that because the wounds were healed, the sexual abuse would probably have taken place more than two to three weeks before Shadai's death.

¶13. Detective Phil Burnham arrested Gerry at the hospital at 10:30 on the night of Shadai's death and read Gerry his *Miranda* rights. Lester was found guilty of capital murder and sentenced to death by lethal injection.

<u>STATEMENT OF THE LAW</u>

**I.**

**THE TRIAL COURT ERRED IN OVERRULING LESTER'S OBJECTIONS TO VOIR DIRE QUESTIONS BY THE PROSECUTOR WHICH WERE HYPOTHETICAL, DESIGNED TO CONFUSE AND MISLEAD THE JURY OR TO COMMIT THEM TO A VERDICT PRIOR TO TRIAL.**

**A.**

**Misinforming Jury of the Law**

**1. Mitigating Circumstances Must Outweigh the Aggravating**

¶14. In Lester's first assignment of error, he claims that the prosecutor committed reversible error during voir dire by misinforming the jury that the defendant has the burden of proving that the mitigating circumstances outweigh the aggravating circumstances in order to avoid the death penalty. He points to the discussion that occurred during voir dire involving venire member Julie Moore. Lester asserts that during this exchange, Mr. Peters misinformed the jury by telling them that the defendant had the burden of proving that the mitigating circumstances outweighed the aggravating circumstances. This claim is simply untrue. Mr. Peters correctly stated the law, as set out in Miss.

Code Ann. § 99-19-101. This Court has stated, "Miss. Code Ann. § 99-19-101(2)(c) clearly requires that the jury find that the mitigating circumstances outweigh the aggravating circumstances." *Foster v. State*, 639 So.2d 1263, 1301 (Miss. 1994) (citing *Shell v. State*, 554 So.2d 887, 904 (Miss.1989); *Jordan v. State*, 365 So.2d 1198, 1205 (Miss.1978); *Gray v. Lucas*, 677 F.2d 1086, 1105-1106 (5th Cir.1982)). This Court has also previously rejected the argument that the burden of proof is shifted by requiring that the mitigating circumstances outweigh the aggravating circumstances. *Mack v. State*, 650 So.2d 1289, 1330 (Miss. 1994). Therefore, Lester's argument on this issue is without merit.

¶15. Ms. Moore was obviously confused as to what the law was with regard to weighing the mitigating and aggravating circumstances during the sentencing phase. The trial court correctly sustained the prosecutor's objection to Mr. Malouf's statements in which he attempted to misinform the jury on this aspect of the law, and correctly informed Ms. Moore and the rest of the jury that they would be given instructions during the sentencing phase if the trial reached that point. Any lingering confusion was cleared by the jury instructions given during the sentencing phase regarding the proper weighing process, because it is presumed that the jury follows the instructions of the trial court. *Johnson v. State*, 475 So.2d 1136, 1142 (Miss. 1985) (citing *Payne v. State*, 462 So.2d 902, 904 (Miss.1984); *Carter v. State*, 450 So.2d 67, 69 (Miss.1984)); *Chase v. State*, 645 So.2d 829, 853 (Miss. 1994).

¶16. Lester points to other occasions during voir dire in which Lester argues that Mr. Peters misinformed the jury of the procedure for weighing aggravating and mitigating circumstances. However, these other statements are all correct in assessing § 99-19-101 as requiring the jury to find that the mitigating circumstances outweigh the aggravating circumstances. Discussion of these statements, therefore, is unnecessary. This assignment of error is unpersuasive.

## 2. Telling Jurors They Could Not Consider Residual Doubt or That the Case Was Circumstantial In Deciding to Impose Death

¶17. Lester argues that Mr. Peters improperly instructed the jury that they could not consider residual doubt during the sentencing phase, and then secured commitments from several jurors that they would not consider residual doubt. A criminal defendant has no right to have residual doubt considered by the jury during sentencing. *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Hansen v. State*, 592 So.2d 114, 150-51 (Miss. 1991) (citing *Minnick v. State*, 551 So.2d 77, 95 (Miss. 1988) (*overruled on other grounds by Minnick v. State*, 498 U.S. 146 (1990); *reversed in part on other grounds by Willie v. State*, 585 So.2d 650, 680-81 (Miss. 1991)). However, a defendant is free to argue residual doubt. *See Hansen*, 592 So.2d at 151; *Minnick*, 551 So.2d at 95.

¶18. Lester claims that by instructing the jury that they could not consider residual doubt and securing promises from the jury that they would not consider residual doubt, Mr. Peters effectively precluded Lester from arguing residual doubt. However, Lester cites no authority supporting the proposition that a defendant has a right to argue residual doubt. The cases which Lester cites merely state that a defendant is free to argue residual doubt "to a relevant extent." *Minnick*, 551 So.2d at 95 (citing *Franklin*, 487 U.S. at 174-75). The United States Supreme Court declined to recognize any right of a defendant to have the jury consider residual doubt in its decision in *Franklin*. *Franklin*, 487 U.S. at 174-75. This argument is also unpersuasive, because Lester was certainly free to argue

residual doubt during the sentencing phase, and did so, asking the jury to consider any remaining doubt during its deliberations on sentencing. As a result, this assignment of error is unpersuasive and without merit.

### 3. Law and Evidence

¶19. Lester next complains that Mr. Peters improperly told the jury that reasonable doubt must be "based upon the law and the evidence and not upon some imaginary doubt." Lester's argument is that Mr. Peters failed to inform the jury that reasonable doubt could be based upon a lack of evidence. This assertion is uncompelling, because the phrase "based upon the law and evidence" inherently includes consideration of a lack of evidence. Regardless, the trial court's jury instructions corrected any potentially misleading comments by giving adequate instruction on reasonable doubt in Instructions C-3 and D-18 (instructions on presumption of innocence, reasonable doubt, and the exclusion of every reasonable hypothesis consistent with innocence). Furthermore, Instruction D-3 specifically stated that reasonable doubt of the defendant's guilt "may arise out of the evidence *or the lack of evidence* in this case." (emphasis added). Even if Mr. Peters made improper statements concerning reasonable doubt, the trial court's proper instructions removed any error. ***See Johnson***, 475 So.2d at 1142.

### B.

### Convincing the Jury That It Was Their Duty to Convict

**¶20.** During voir dire, without any objection by Lester, the prosecutor asked the venire if they would be intimidated by the polling of the jury to the point of it influencing their decision. One juror did raise his hand and admit that he would find it "a challenge" to be polled after a guilty verdict in this case. Lester argues that the prosecutor implied in these statements that it would be dangerous for the jury to vote not guilty, and thereby secured a promise from the jurors that they would set aside their fear of the defendant and vote guilty. However, Lester made no objection at trial to these comments, so he is procedurally barred from raising this issue on appeal. ***See Carr v. State***, 655 So. 2d 824, 853 (Miss. 1995) (holding that errors are waived when no objection is made). Aside from the procedural bar, this interpretation of the prosecutor's comments is erroneous. The prosecutor was simply explaining the process of returning the verdict and polling the jury to make sure that no jurors would be intimidated or influenced by the procedure. No suggestion was made that the jury should fear the defendant, and no promises were secured that the jurors would vote guilty. Lester's argument is therefore without merit.

¶21. Over Lester's objection, Assistant District Attorney Cynthia Speetjens commented on the difficulty in the task of voting for the death penalty. Lester argues that this line of closing argument improperly and prejudicially called upon the jury to exercise its moral courage to sentence Lester to death. He points to ***Leverett v. State***, 73 So. 273, 273-74 (Miss. 1916), in which this Court reversed the case because of improper questions by the trial court on voir dire. In that case the court questioned jurors on sentiment as a negative comment on the defense theory of self-defense. ***Id***. at 274. The court further questioned the jury as to whether they had the moral courage to vote guilty if they found that the defendant was guilty of murder beyond a reasonable doubt, and if they had the nerve to do their duty. ***Id***. This Court held that such voir dire was in error, because it had the effect of informing the jury that it had a duty to convict. ***Id***. "Each juror was given to understand that he

would be a man of very little moral courage unless he found a verdict of guilty in this case. Such examination was erroneous, and very prejudicial to the defendant." *Id*.

¶22. Here, the prosecution's comments did not give the jury the impression that they had a duty to convict, but merely that voting for the death penalty is a difficult task. This case is also distinguishable from *Leverett*, because in that case the erroneous comments were made by the trial judge during voir dire. Here the statements to which Lester objects were made by the prosecutor during closing argument. In *Blue v. State*, 674 So.2d 1184, 1208 (Miss. 1996), this Court determined that a prosecutor's comments that the weight of the evidence supported the death penalty were proper. Ms. Speetjens's comments were properly made to argue that the weight of the evidence supported a sentence of death.

## C.

### Commitments to Ignore Mitigating Circumstances

¶23. Lester failed to object to any of the comments or questions during voir dire which he points to in this assignment of error. He is, as a result, procedurally barred from raising this issue on appeal. *See Carr*, 655 So. 2d at 853. Without waiving the procedural bar, this issue is uncompelling for the reasons discussed below.

### 1. Prior Criminal History

¶24. Lester argues that the prosecution obtained commitments by jury members to ignore the mitigating circumstance of no "significant history of prior criminal activity" through improper questioning during voir dire. However, Lester did, in fact, have a prior criminal history; he was previously convicted of grand larceny, a felony. All of the prosecutorial statements which Lester points to were made in response to the information given by the jurors on their jury information questionnaires. These were proper questions regarding the ability of the jury to follow the law. No attempt was made by the prosecution in this case to secure promises from jurors that they would not consider a lack of criminal history as a mitigating circumstance. This assignment of error is procedurally barred and without merit.

### 2. Age

¶25. Without any objection from Lester, Mr. Peters asked the jury during voir dire if they would be "unduly influenced" by the defendant's age during sentencing. Lester claims that the prosecution, as a result, received commitments from the jury not to consider age as a mitigating factor. This assignment of error is ineffective, because Mr. Peters only asked the jury if they would be "unduly influenced" by Lester's young age, not if they would consider it at all. The jury was properly instructed to consider Lester's age as a mitigating circumstance in the court's jury instructions, so any resulting error was cured. *See Johnson*, 475 So.2d at 1142. This issue is similarly barred and without merit.

### 3. Absence of Premeditation, Intent Or Plan

¶26. Mr. Peters questioned the jury regarding premeditation in the same manner as he questioned them regarding prior criminal history. Some jurors responded on their jury information questionnaires

that they would only favor the death penalty in cases of premeditated or intentional murder. Mr. Peters, therefore, properly asked them if they would require the State "to show some plan to kill this child, some preconceived plan, intentional act to go out and take this child and murder it" before considering the death penalty. Since the law, in fact, does not require such a showing by the prosecution for consideration of the death penalty, no error occurred.

### 4. Promise to Impose Death No Matter What Defense Witnesses Said

¶27. Lester claims that Mr. Peters obtained promises from the jurors that they would ignore Lester's character witnesses and vote for the death penalty regardless of those character witnesses. This is simply untrue. Mr. Peters asked the jury if they would *automatically vote against the death penalty* if Lester had character witnesses to testify on his behalf. Mr. Peters merely asked if the jury would give only proper consideration to mitigating circumstances, such as character evidence. We find no merit to this argument.

### D.

### Excuse to Find Him Not Guilty and Disparaging Reasonable Doubt

¶**28.** Lester claims that comments by the prosecution had the effect of equating reasonable doubt with an excuse to find the defendant not guilty. He points to **Williams v. State**, 445 So.2d 798, 808 (Miss. 1984), in which this Court held that the prosecutor's remarks during closing argument were improper. In that case, however, the prosecutor specifically said that self-defense was an excuse for voting not guilty. **Id**. at 808. An objection to the remark was sustained, followed by two more remarks along the same lines which were properly objected to, and the objections sustained. **Id**. This Court held that the remarks were improper because they were not based in the evidence presented at trial. **Id.**

¶29. This case is very different from **Williams**. First of all, Lester's only objection at trial was that Mr. Peters did not mention lack of evidence as a basis for reasonable doubt. As a result, Lester is barred from raising this issue on appeal, because objection on one ground at trial waives all other grounds for objection on appeal. **See Conner v. State**, 632 So.2d 1239, 1255 (Miss. 1993) (citing **Stringer v. State**, 279 So.2d 156, 158 (Miss. 1973) and **McGarrh v. State**, 148 So.2d 494, 506 (Miss. 1963)).

¶30. This issue is also unpersuasive, because Lester incorrectly summarizes the statement which Mr. Peters made in voir dire regarding reasonable doubt. The actual statement was, "[B]eing unreasonable looking for an excuse is what I call it. All of you assure the Court if you find a doubt, you're willing to be reasonable about it. Everyone?". Mr. Peters did not equate reasonable doubt with an excuse to find Lester not guilty. He equated *unreasonable* doubt with an excuse. Furthermore, as discussed above, the trial court properly instructed the jury on reasonable doubt, so any error was effectively cured. This argument is therefore ineffective, and no reversible error occurred through this statement.

### E.

### Speculations About What Jurors Would Do If Other Jurors Disagreed

¶31. Without any objection by Lester, Mr. Peters asked the jury during voir dire if they would be "willing to discuss the case with the other jurors and change their mind if the other jurors convinced them that the law and the evidence justified whatever verdict they were voting for." Lester asserts that this was improper questioning, asking the jury to speculate about what they would do if other jurors disagreed with them. Since Lester raised no objection at trial, this issue is procedurally barred. *See Carr*, 655 So. 2d at 853. Additionally, this argument is not supported by any Mississippi law. Lester points to *State v. Tally*, 22 S.W.2d 787, 788 (Mo.1929), in which a defense attorney's question during individual voir dire was found improper, because he asked the juror to tell the court what he would do if all of the other jurors disagreed with him. Here, Mr. Peters did not specifically ask any jurors to speculate as to what they might do if all of the other jurors disagreed with them. He simply asked if they would follow the instruction given by the trial court by discussing the case and changing their vote if they became convinced that their original opinion was wrong. The trial court also properly instructed the jury to discuss the case together during deliberations and to change their opinion if they became convinced that they were wrong. The question was a proper statement of the law, and we do not reverse based upon this assignment of error.

## F.

### Testimony of Experts

¶32. Lester made no objection at trial to the questions which the prosecution asked during voir dire about the testimony of medical experts. Therefore, this issue is barred on appeal. *See Carr*, 655 So. 2d at 853. Mr. Peters asked the jury if they would be skeptical of or unable to rely on the expert testimony of doctors who were not present at the scene, but based their opinions on examinations. He additionally questioned jurors who worked in the medical field if they would second-guess the testimony of the medical experts, or if they would substitute their own opinions for the experts' opinions. Lester points to cases from other jurisdictions which preclude attorneys from asking jurors what weight they would place on evidence which they have not yet heard. However, Lester points to no Mississippi authority. These were proper questions used to determine if the jury could accept circumstantial evidence, and to ascertain whether jurors with a medical background should be challenged for their inability to listen objectively to the testimony of medical experts. The trial judge did not abuse his discretion in allowing this line of questioning during voir dire, so no reversible error resulted.

## G.

### Commitments Not to Consider Mercy

¶33. Lester asserts that it was error for the trial judge to allow Mr. Peters to ask the jury not to let sympathy or mercy influence them during sentencing. However, he refers to a question in which the district attorney properly informed the jury that they should only consider sympathy or mercy *if so instructed by the court*.

¶34. The prosecution's question regarding maximum punishment was meant to clear up misconceptions by jurors expressed in their jury information questionnaire forms that the maximum punishment was life imprisonment. The maximum punishment in Mississippi is the death penalty, so this comment was not a misinstruction.

¶35. Mr. Peters questioned Ms. Husband about her response in her jury information questionnaire in which she said that she favored the death penalty for extremely violent crimes committed by criminals who cannot be rehabilitated. Lester made no objection at trial to the prosecution's voir dire of Ms. Husband, so this issue is barred on appeal. *See Carr*, 655 So. 2d at 853. The question was asked to assure the court that Ms. Husband would not automatically vote against the death penalty because of a bias toward rehabilitation. This line of questioning was proper for the State to determine whether to challenge Ms. Husband for any bias against the death penalty.

¶36. Lester makes no meaningful argument that the prosecution's questions during voir dire reached the level of reversible error as was the case in *Stringer v. State*, 500 So.2d 928, 938-40 (Miss. 1986). In that case, the prosecutor asked the jury if they could or could not vote for the death penalty under certain circumstances. *Id*. at 938. This Court held that since the prosecutor did not specifically secure commitments from the jury to vote for the death penalty during voir dire, no *per se* reversible error occurred, but the conduct combined with other factors amounted to reversible error. *Id*. As previously discussed, the questions which the prosecution asked during voir dire in this case all properly informed the jury of the law. No request was made to secure a promise of a guilty verdict or a vote for the death penalty during voir dire. Therefore, this issue is without merit.

**II.**

**LESTER'S CASE MUST BE REVERSED BECAUSE THE TRIAL JUDGE ERRONEOUSLY ALLOWED THE PROSECUTOR TO AMEND THE INDICTMENT.**

¶37. On the first day of trial, February 16, 1993, the court heard arguments on the defendant's motions in limine to exclude evidence of sexual and physical abuse occurring prior to the time period set out in the original indictment, "on or about September 29, 1991." During this hearing defense counsel Mr. Malouf stated, "I think perhaps if they had amended the [indictment] and said, 'died as a result of child abuse beginning in June of 1991 through September 29th,' they may have squeezed it in. We still would have objected to it, but they may have squeezed it in." The trial court took the matter under advisement and ordered that voir dire continue without any comments from the attorneys about abuse prior to the dates in the original indictment. Upon motion by the prosecution on February 17, the second day of Lester's trial, the court allowed just such an amendment to the indictment over Lester's opposition to include the dates of those previous batteries. The court asked the defense if they wanted a continuance, which they declined so as to prevent further incarceration of Lester, with the understanding that no sexual abuse evidence would be admitted without further ruling by the court. The original indictment in pertinent part read:

> Jerry Lynn Lester in said District, County, and State *on or about the September 29, 1991* did *then and there*, without authority of law, wilfully, unlawfully and feloniously kill and murder Tifinay Nicole Shadi Sanders, a human being, and a child within the meaning of Section 43-21-105(m), Mississippi Code, 1972, as amended, *while he, the said Jerry Lynn Lester, was then and there engaged in the commission of felonious abuse and/or battery* of Tifinay Nicole Shadi Sanders, in violation of Section 97-5-39(2), Mississippi Code, 1972, as amended, contrary to and in violation of Section 97-3-19(2)(f), Mississippi Code, 1972.

(Emphasis added). The amended indictment read in pertinent part:

> Jerry Lynn Lester in said District, County, and State on or about the September 29, 1991 did, without authority of law, wilfully, unlawfully and feloniously kill and murder Tiffany Nicole Shadai Sanders, a human being, and a child within the meaning of Section 43-21-105(m), Mississippi Code, 1972, as amended, while he, the said Jerry Lynn Lester, was then and there engaged in the commission of felonious abuse and/or battery of Tiffany Nicole Shadai Sanders, *by, between the dates of approximately three weeks prior to June 19, 1991 and September 29, 1991, both inclusive, causing physical injury to the child's lip, breaking bone(s) in the child's leg, and causing serious injury to the child's head, and causing serious injury to the child's abdominal region thus resulting in the child's death*, in violation of Section 97-5-39(2), Mississippi Code, 1972, as amended, contrary to and in violation of Section 97-3-19(2)(f), Mississippi Code, 1972.

(Emphasis added). The amendment to the indictment stretched the covered time period by three months. It also added multiple batteries unrelated to Shadai's death, whereas the original indictment only included the battery on or about September 29 which resulted in Shadai's death.

¶38. The trial court committed reversible error by allowing a change in the substance of the indictment on the second day of Lester's trial. "It is fundamental that courts may amend indictments only to correct defects of form, however, defects of substance must be corrected by the grand jury." ***Rhymes v. State***, 638 So.2d 1270, 1275 (Miss. 1994).

> It is well settled in this state, as was noted by the learned circuit judge, that a change in the indictment is permissible if it does not materially alter facts which are the essence of the offense on the face of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood so as to prejudice the defendant's case.

***Shelby v. State***, 246 So.2d 543, 545 (Miss. 1971)(citations omitted) (not reversible error for trial court to amend indictment by changing date of offense by one day). ***See also Wilson v. State***, 574 So.2d 1324, 1332-33 (Miss. 1990) (not reversible error to quash indictment of first trial ending in hung jury and issue new indictment in which additional stolen items were added to the charge of capital murder during commission of armed robbery); ***Griffin v. State***, 540 So.2d 17, 19-21 (Miss. 1989) (reversible error for trial court to amend indictment from assault with a deadly weapon by shooting the victim in the head to assault by using a pistol, a means likely to produce serious bodily harm). Certainly it cannot be said that the facts underlying the offense in Lester's indictment were not materially altered by adding three more cases of battery to the charge.

¶39. The State points to ***Hall v. State***, 611 So.2d 915, 923 (Miss. 1992), in which this Court found no merit in the defendant's argument concerning a second amendment to his indictment. The dates of the alleged offense were changed on that indictment from "between August 1, 1984 and September 30, 1984" to "between the first day of August, 1984 and November 15, 1984" and then to "between the first day of October, 1984 and the 30th day of November, 1984." ***Id***. However, Hall's "confusing argument" was that he was denied a trial *de novo* because the state's second amendment to the indictment only amended the first amendment and not the original. ***Id***. The issue of form versus substance in altering the indictment was neither raised nor addressed by this Court. Also, in ***Hall***, the changes to the indictment were merely date changes, and did not alter the indictment to include additional criminal acts. Therefore that case has no bearing on the this case.

¶40. The State also cites ***Baine v. State***, 604 So.2d 258, 259-61 (Miss. 1992), to support its contention that unless time is an essential element of the crime, an amendment to change the date on which the alleged crime took place is a mere change in form, not substance. However, the change here was not merely a change of dates; there was also a change by adding multiple battery offenses. Therefore, ***Baine*** is also unhelpful to the issue before us.

¶41. The State also asserts that this assignment of error should fail, because the defendant has failed to show prejudice in the form of a defense becoming unavailable as a result of the amended indictment. ***Byrd v. State***, 228 So.2d 874, 875-76 (Miss. 1969) (holding that if the evidence and defenses are the same for the amended indictment and the original indictment, then the change is one of form and not substance). The State further argues that if Lester felt that the amended indictment prejudiced his defense, then he should have requested a continuance when the trial judge asked if he wanted one. This argument fails, because Lester's burden of defending three additional instances of battery is obvious prejudice. ***See Stirone v. United States***, 361 U.S. 212 (1960) (in which the Supreme Court held that amending the essential facts in the indictment was reversible error *per se* without any inquiry into prejudice). The trial court would still have lacked the authority to amend the indictment, even if a continuance had been granted. Failure to request a continuance does not bar consideration of this issue.

¶42. Lester's additional argument that the amendment rendered the indictment duplicitous and that the crime of capital murder cannot be committed during the course of abuse continuing over several months is ineffective. Lester points to the case of ***Houston v. State***, 531 So.2d 598, 606 (Miss. 1988) in which we noted the problem of recognizing felonious child abuse as an episodic offense in cases of felony murder where the prior abuse occurs months before the killing, thereby breaking the causal chain. *Id*. at 606 n.5. We failed to answer that question in ***Houston***, because in that case the evidence of felonious abuse on or about the date of death was substantial. *Id*. Similarly, in this case there is ample evidence of abuse on the date of Shadai's death, so the remoteness of the episodic abuse prior to the date of death cannot be said to have prejudiced Lester at trial. This Court has previously held that child abuse can be shown through a series of injuries, so the addition of other instances of battery against Shadai did not render the indictment duplicitous. ***See Aldridge v. State***, 398 So.2d 1308, 1311-12 (Miss. 1981). ***See also Houston, supra*** at 606. Felonious child abuse may be shown as an episodic crime, and it is one of the underlying felonies for capital murder under Miss. Code Ann. § 97-3-19(2)(f). The logical conclusion, then, is that all of the acts of episodic child abuse should be admissible as evidence of capital murder committed while engaged in felonious child abuse.

¶43. The trial court did err, however, in allowing the indictment to be substantially amended by adding the additional time period and additional instances of battery. The amendment to the indictment was one of substance and therefore could only have been made by the grand jury. We therefore hold that the trial court committed reversible error in ordering the amendment.

### III.

### THE TRIAL JUDGE ERRED IN ALLOWING THE PROSECUTORS TO ELICIT IMPROPER OPINIONS FROM EXPERT WITNESSES.

### A.

### Hypothetical Questions Not Based On the Evidence

**¶44.** Lester next assigns as error the use of hypothetical questions by the prosecution in examining its expert witnesses, with no basis in the evidence. Lester raised no objection to these questions at trial, so this issue is procedurally barred. *See Carr*, 655 So. 2d at 853. Notwithstanding the procedural bar, this issue is meritless. It is true that expert opinions, including those elicited through hypothetical questions, must be based in the evidence. *See West v. State*, 553 So.2d 8, 20-21 (Miss. 1989); Miss. R. Evid. 702, 703. However, in this case, the hypothetical questions to which Lester refers were based firmly in the evidence presented. Testimony was given at trial that Lester explained Shadai's broken leg as an accident which occurred when her leg became stuck in the couch. In fact, defense counsel was also allowed to ask his expert if the spiral fracture could have been caused by Shadai being jerked out of the couch. It was therefore proper for the prosecution to question its experts as to whether the type of spiral fracture in Shadai's femur was consistent with this explanation.

### B.

### Questions Calling For Legal Conclusions

**¶45.** Lester next assigns as error the admission of testimony by Dr. Hayne that his opinion within reasonable medical certainty was that Shadai's death was the result of a purposeful act, i.e. that Shadai was murdered. First of all, this issue is similarly barred because Lester failed to make any objection at trial. *See Carr*, 655 So. 2d at 853. Aside from the procedural bar, Lester's argument is also unpersuasive. This Court previously held in *Kniep v. State*, 525 So.2d 385, 390-91 (Miss. 1988), that it was error for the trial court to exclude the expert opinion of the State Medical Examiner that Kniep's death was caused by accidental ingestion of isopropyl alcohol and not murder. The Mississippi Rules of Evidence no longer preclude opinions on the ultimate issue of fact. Miss. R. Evid. 704. We therefore hold that it was not error for the trial court to admit the expert opinion of Dr. Hayne that Shadai's death was caused by murder and not accident.

### IV.

### LESTER WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY THE TRIAL JUDGE'S DENIAL OF HIS REQUEST FOR CONTINUANCE FOR ADEQUATE TIME TO PREPARE.

¶46. Over continued objection by Lester, the court ruled to admit the testimony of Dr. Hayne that Shadai was sexually abused prior to her death in order to negate the theory of accident. In light of that ruling, Lester made a motion for a two-week continuance in order to prepare a defense of the sexual allegations. The court granted a one-hour recess, but refused the request for a continuance. Lester was denied his right to effective assistance of counsel and a fair trial, because of the prejudice resulting from insufficient time to prepare for this surprise evidence. The Sixth Amendment right to assistance of counsel is not satisfied unless the accused's attorney is given adequate time to prepare his defense. *See Powell v. Alabama*, 287 U.S. 45, 59 (1932).

¶47. The State's contention is that Lester was not surprised at all by the admission of evidence of sexual abuse, because he was fully aware of the potential that this evidence could be admitted from the time that he received the autopsy reports showing evidence of sexual abuse. To support this

argument they also point out that no surprise witnesses were called as in the cases of *Galloway v. State*, 604 So.2d 735 (Miss. 1992) and *Traylor v. State*, 582 So.2d 1003 (Miss. 1991), both cited by Lester.

¶48. While Lester may have been aware that evidence existed that Shadai had been sexually abused, the indictment under which he was charged did not include any counts of sexual abuse. In fact, there is a separate subsection of the statute under which Lester was charged which specifically deals with murder done while engaged in "unnatural intercourse with any child under the age of twelve." Miss. Code Ann. § 97-3-19(e). Since Lester was charged under subsection (f) and not subsection (e), he would have no reason to expect that evidence of Shadai's sexual abuse would be admitted at his trial.

¶49. Furthermore, the trial court in response to Lester's motion in limine agreed that the sexual abuse would not be admitted unless shown to be a contributing cause of death or to refute the theory of accident if shown to have more probative value than prejudicial effect. While Lester may have suspected that the prosecution would attempt to present evidence of Shadai's sexual abuse at trial, he certainly had good reason to believe that the trial court would exclude it, as it should have. The admission of Dr. Hayne's testimony regarding the sexual abuse was therefore a surprise to Lester which warranted a continuance for adequate time to prepare a defense of these new allegations.

¶50. "[T]he decision to grant or deny a continuance is one left to the sound discretion of the trial court." *Johnson v. State*, 631 So.2d 185, 189 (Miss. 1994). However, in this case, the trial court abused its discretion in refusing Lester's request for a continuance in order to adequately prepare a defense of the surprise introduction of sexual abuse evidence.

**V.**

**THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF LESTER'S POST ARREST SILENCE.**

¶**51.** Without any objection by Lester, Assistant District Attorney Cynthia Speetjens asked Dr. Donaldson the following questions on redirect:

Q. Dr. Donaldson, prior to the trial of this case you met with me and my investigator and these two attorneys; is that right?

A. That's correct.

Q. At any other time than that meeting when we were all there present together, have you ever met with these attorneys to discuss this case?

A. No.

Q. At anytime during that meeting, did they ever discuss the theory with you that the child was pulled up out of the couch?

A. No.

Q. Did they ever even mention that the child was pulled up out of the couch?

A. No.

Lester claims that this was improper comment by the prosecution on Lester's post-arrest silence. First, since Lester raised no contemporaneous objection to this line of questioning, he is barred from raising it on appeal. *See Carr*, 655 So.2d at 853. Second, these questions are not about anything that Lester said or didn't say; they are questions about what Lester's attorneys discussed with Dr. Donaldson prior to trial. Third, the questions refer to Shadai's broken leg, which occurred in June, three months before Lester's arrest. Therefore, even if the questions were aimed at what Lester said or didn't say about Shadai's broken leg, they wouldn't be comments on his post-arrest silence.

¶52. Lester similarly points to questions which the prosecutor asked Dr. Donaldson on further direct examination:

Q. Counsel asked you whether or not there could be other facts out there that you're not aware of that might change your opinion; is that right?

A. That's correct.

Q. You met with these lawyers; did you not?

A. Yes.

Q. You discussed this injury at length; did you not?

A. Yes.

Q. As recently as when?

A. Seems like it was last week, maybe the week before.

Q. And what, if any, information did they give you from themselves or any witness that they might produce that would change your opinion?

. . . .[objection overruled]. . . .

Q. What, if any, information did you get from those people during your conversation as recently as last week or so? What other facts might they have given you to consider that might change your opinion?

. . . .[objection sustained]. . . .

Q. Has anyone during the course of the preparation of this trial furnished you or any other doctor that you're aware of any other facts surrounding this incident that might change your opinion?

A. No.

While Lester did make a timely objection, these questions make no specific reference to what Lester said. The intent of the questions was to follow up on Lester's inquiry into the possibility of other facts existing which could change Dr. Donaldson's opinion. This was proper redirect examination which

made no comment on Lester's post-arrest silence.

¶53. Over an objection by Lester for improper comment on his post-arrest silence, the prosecution was allowed to ask Dr. Blumenthal the following questions:

> Q. [H]as anybody ever given you any other history that may have come from the parent of this child other than what's in that report?
>
> A. No, not that I can recall.
>
> Q. Were you present at a conference between myself and Dr. Donaldson and these two attorneys?
>
> A. Yes, I was.
>
> Q. At anytime was any other scenario discussed?
>
> . . . .[objection overruled]. . . .
>
> Q. Dr. Blumenthal, other than: She caught, while I was in bathroom, her leg in the space of a couch at the house, and since then she has been crying--anything other than that as far as a history have you been provided by myself, the police, the Department of Human Services, these attorneys in conversation, anybody else anywhere, any more history than that as far as what was given at the hospital that night?
>
> A. I don't believe so.

It is true that this time the prosecution specifically asked whether Lester had ever given any other explanation for Shadai's broken leg. However, as stated earlier, the broken leg occurred well before Lester's arrest, so any silence on his part concerning the cause of her broken leg would not be post-arrest silence. As a result, questioning the expert witnesses about Lester's explanation for Shadai's broken leg cannot be said to constitute improper comment on Lester's post-arrest silence. No violation of the due process clause of the 14th Amendment or of Lester's right against self-incrimination occurred.

## VI.

### THE CUMULATIVE EFFECT OF THE INTRODUCTION OF OTHER OFFENSE AND BAD ACTS EVIDENCE AND THE PROSECUTION'S IMPROPER SUGGESTION THAT THE JURY SHOULD USE THE EVIDENCE TO CONVICT THE DEFENDANT BECAUSE OF HIS BAD CHARACTER CALLS FOR REVERSAL OF BOTH THE GUILT AND PENALTY PHASES OF LESTER'S TRIAL.

¶54. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Miss. R. Evid. 404(b). Such evidence may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. However, all otherwise admissible evidence must still pass the test set out in Miss. R. Evid. 403, requiring that its probative value outweigh any resulting unfair prejudice. In addition, when prior acts are admitted to refute a defense of accident or mistake, sufficient evidence

must be shown, not necessarily by a preponderance of the evidence, for the jury to determine that the defendant actually committed the prior acts. *See Huddleston v. United States*, 485 U.S. 681, 685, 689-692 (1988); *Cardwell v. State*, 461 So.2d 754, 760 (Miss. 1984). A limiting instruction should be given when requested to instruct the jury that the evidence is only to be used in disproving accident or mistake, and not to prove that the defendant acted in conformity with the prior act. *Huddleston*, 485 U.S. at 692.

## A.

### Evidence That Lester "Ran the Streets"

¶**55.** During cross-examination of Brenda Lester, the prosecution read part of a letter from Gerry Lester to Ruchelle Sanders in which he apologized for "running the streets." The prosecution then continued by questioning Brenda and Carl Jacobs about whether Gerry Lester "ran the streets." During closing argument, the prosecution argued that Lester's motive for killing Shadai was that he was angry because Ruchelle made him stay home and take care of the baby, since he was unemployed, instead of letting him "run the streets."

¶56. Lester now argues that these were inadmissible, irrelevant references to his bad character, which were highly prejudicial. However, it appears from the record that Lester made no objection to the prosecutor's questions or comments during closing argument on his "running the streets." Therefore, this issue is barred on appeal. *See Carr*, 655 So.2d at 853. Furthermore, since the prosecution used this evidence to show motive, it is admissible under the exception set out in Miss. R. Evid. 404(b). As Lester made no contemporaneous objection to this evidence at trial, the court was not given an opportunity to weigh its probative value against its prejudicial effect. Admission of evidence that Lester "ran the streets" was not error by the trial court, and we do not reverse on this issue.

## B.

### Evidence That Lester's Brothers Were Criminally Inclined

¶57. During the direct testimony of Lester's father, Percy Lester, he stated that he had tried to raise his children to be good and to stay out of trouble and had "always worked them." During cross-examination, over Lester's objection, the prosecution elicited testimony from Percy Lester that his son Eddie had been convicted of four felonies and that his son Johnny had been convicted of one felony. Then, during closing argument in the guilt phase, the prosecutor mentioned their children's felony convictions in arguing that both Percy and Annie Lester's testimony was unreliable. Lester asserts on appeal that this evidence was inadmissible and improperly used by the prosecution. However, since Lester did not object to the prosecutor's statements during closing argument, he is procedurally barred from raising this assignment of error on appeal. *See Carr*, 655 So.2d at 853.

¶58. Furthermore, evidence of Lester's brothers' prior felony convictions was properly admitted after the court determined that the probative value outweighed any prejudicial effect. Evidence of Eddie and Johnny's prior convictions was properly admitted to refute Percy Lester's testimony that he tried to raise his children to be good, law-abiding citizens. This was not an attack on character, but was proper impeachment testimony, because there was reason to doubt the credibility of Percy and Annie Lester based upon the evidence.

## C.

### Evidence That Gerry Lester Had Been Charged With Other Crimes and Violated His Probation

¶**59.** Lester's own expert witness in psychology, Dr. Gerald O'Brien, testified that Lester had told him about two previous occasions on which Lester had been arrested but not convicted. On cross-examination Mr. Peters further questioned Dr. O'Brien concerning an incident while Lester worked at Pecan Man (of which O'Brien knew nothing) and a charge for trespass and burglary at Mississippi Power & Light. O'Brien answered that Lester told him about a time when Lester was riding around in a stolen car and when Lester broke into an MP&L facility with a group. Later, during O'Brien's testimony, the prosecution entered a certified copy of Lester's grand larceny conviction into evidence over Lester's objection. The trial court decided to allow this evidence after determining that its probative value outweighed any prejudicial effect. Lester explained during his testimony that he did not know that he had been convicted, because he never had to serve time in the penitentiary. During closing argument Mr. Peters used this evidence to attack the credibility of Lester and Dr. O'Brien.

¶60. Then during cross-examination of Lester, over Lester's objection, Mr. Peters asked Lester if he had promptly reported to his probation officer for his suspended sentence. Lester testified that he reported to his probation officer every month. Susan Lloyd, Lester's probation officer between March of 1989 and March of 1990, testified that he did not report to her in a timely fashion, which is why Lester became an adjudicated felon. Assistant District Attorney Speetjens used this testimony during closing argument to portray Lester as a liar.

¶61. Lester now argues that it was error for the trial court to admit any evidence of his prior felony conviction during Dr. O'Brien's testimony, and that the questions concerning his probation period before being adjudicated a felon were irrelevant and inadmissible. Lester made no objection to the initial questions asked of Dr. O'Brien regarding the previous crimes; he also failed to object to the prosecution's comments during closing argument. Therefore, we need not consider the merit of Lester's argument on their admissibility. *See Carr*, 655 So.2d at 853.

¶62. Notwithstanding the procedural bar, Lester opened the door to this line of questioning concerning his past criminal history through the testimony of his own expert witness. The trial judge made a proper determination that after Dr. O'Brien testified that Lester had never been convicted, the probative value of admitting the certified copy of his criminal conviction outweighed any resulting prejudice. Any such prejudice cannot be said to be unfair as set out in Miss. R. Evid. 403, because Lester's own witness first introduced the discussion of Lester's criminal past. It would, in fact, have been unfair to the prosecution to allow the jury to proceed under the misconception that Lester had no prior conviction.

¶63. Regarding the evidence of Lester's failure to report regularly to his probation officer, Lester correctly states that it is improper to elicit testimony regarding the details of a prior conviction. *Stringer v. State*, 500 So.2d at 942 (citing *Allison v. State*, 274 So.2d 678 (Miss. 1973); *Mangrum v. State*, 232 So.2d 703 (Miss. 1970). However, this was not evidence of Lester's prior conviction, but of his sentence. It was not an abuse of discretion for the trial court to admit this evidence, so this assignment of error is without merit.

## D.

### Cross-examination of Jeanette Rena Shields

¶64. Jeanette Rena Shields testified on behalf of Lester during the guilt phase. She stated that she had a daughter whom Lester treated as his, although they were not sure whether Lester was the baby's father. She further testified that Lester provided money and clothes for the baby and "treated her like a loving person would treat any other child." Lester now complains that the prosecutor's questions of Ms. Shields regarding Lester's ceasing to have a relationship with her daughter or to contribute money toward her support was improper and prejudicial. However, Lester made no objection to these questions at trial, so this assignment of error is procedurally barred. Furthermore, this argument is completely unpersuasive, because the prosecutor's questions were directly related to the questions asked of Ms. Shields on direct examination. The questions were proper cross-examination, so no reversible error resulted.

## E.

### Cross-examination of Gerry Lester--Guilt Phase

¶65. The prosecution's cross-examination of Lester during the guilt phase was argumentative, abusive and full of insinuations of bad character. Questions regarding Lester's participation in the Job Corps and his lack of employment during his relationship with Jeanette Shields were proper, because they were directly related to Lester's testimony about being in the Job Corps and his other employment history. Questions asked of Lester on his failure to support Jeanette Shields's baby were also proper in response to Shields's testimony that Lester was a good father to her child. Lester opened up the discussion of his religious beliefs during Dr. O'Brien's testimony regarding Lester's responses during one of his psychological exams. It was then legitimate for Mr. Peters to ask Lester about his failure to marry Ms. Shields, the fact that he didn't go to church on the day that Shadai died, and whether he had ever taken Shadai to church. Similarly, Lester's trouble in school and his drinking beer on the day of Shadai's death were both brought up during Lester's testimony on direct, so it was not improper for the prosecutor to ask follow-up questions on these topics.

¶66. However, we find that reversible error resulted from other improper questions. "In cases where an appellant cites numerous instances of improper and prejudicial conduct by the prosecutor, this Court has not been constrained from considering the merits of the alleged prejudice by the fact that objections were made and sustained, or that no objections were made" *Smith v. State*, 457 So.2d 327, 333-34 (Miss. 1984) (citing *Wood v. State*, 257 So.2d 193, 200 (Miss.1972); *Howell v. State*, 411 So.2d 772, 776 (Miss.1982); *Forrest v. State*, 335 So.2d 900, 902 (Miss.1976)).

¶67. Mr. Peters first questioned Lester, over objection, about his job at Cash for Cans, asking whether that had anything to do with his conviction for grand larceny at MP&L. He followed up that question by asking Lester if he knew where the spindles that were stolen had been sold. These were improper questions on the details of Lester's prior conviction. *See Stringer*, 500 So.2d at 942. Although the prosecutor abandoned the question after discussion outside the presence of the jury, the prejudicial effect had already resulted.

¶68. Mr. Peters also suggested during cross-examination and closing argument that Lester didn't

abuse his daughter by Jeanette Shields only because he had not seen her since she was three months old. During closing argument, the prosecutor stated, "And he didn't even have a chance at that child, thank God. Because he never even saw it after it was three months old to the child's ever-living glory. That child didn't get abused because he wasn't there long enough." The State asserts that this line of questioning and argument was proper in response to the defense putting on evidence that Lester treated Shields's daughter well. However, the prosecutor's suggestive remarks went well beyond mere rebuttal of Lester's treatment of Shields's daughter. These comments and questions were improper, not based in the evidence, and highly prejudicial.

¶69. The combined effect of the prosecutor's improper, irrelevant, and prejudicial cross-examination and closing argument was to unfairly prejudice Lester in the eyes of the jury. This prosecutorial misconduct resulted in reversible error.

## F.

### Cross-examination--Sentencing Phase

¶70. The prosecutor also elicited testimony of improper bad character evidence during the sentencing phase of Lester's trial. The prosecutor's questions, asked of James Clarke and Donnell Amiker, about Lester having a child by another woman, failure to report to his probation officer, and drinking beer around the children were improper, irrelevant, and prejudicial. However, the most inappropriate and damaging line of questioning which the prosecution pursued occurred during the cross-examination of Gerry Lester's uncle, Troy Lester. Over Lester's continuing objections, the following exchange took place:

Q. Have you heard that one of the things that he's--one of the things that was offered during the testimony was that he was probably the person who anally and sexually assaulted this child?

A. I heard that it was probably, you know. I can't believe it.

Q. What if there was an eyewitness to that; would you believe that?

. . . .[Objection overruled]. . . .

Q. Would you believe it then?

A. It would depend on who the witness was.

Q. Well, of course, you wouldn't believe the seven year old child that was there; would you?

. . . .[Objection]. . . .

A. No. No, sir.

A. No, sir. Because I would believe a seven year old child could be coerced--

. . . .[Objection]. . . .

A. --Into saying what you wanted him to say.

Q. Okay. What kind of witness would it take to convince you then?

A. I would say a responsible person who hasn't got any ties or hasn't got anything to profit, you know, or who couldn't be coerced.

Q. Who is it that you think would coerce that child into saying something like that?

. . . .[Objection sustained]. . . .

This testimony suggested that Shadai's older brother, Kendrick, had witnessed Lester sexually abusing her. No such testimony was ever elicited from Kendrick at trial. Clearly, the prosecution should not have been allowed to ask questions without any evidentiary basis. Such questions are irrelevant and were highly prejudicial in this case. Unreliable testimony concerning the sexual abuse of Shadai was particularly prejudicial, considering the social stigma attached to sexual abuse of children. Even if this testimony were otherwise admissible, its prejudicial effect far outweighed any probative value which it might provide, thereby rendering it inadmissible. Miss. R. Evid. 403. The trial court committed reversible error in failing to sustain Lester's objection to this line of testimony.

### G.

### Evidence of Shadai's Injuries

**¶71.** The most unfairly prejudicial evidence presented at Lester's trial was the evidence that Shadai had been sexually abused prior to her death. The trial judge permitted the prosecutor to question Dr. Hayne during cross-examination in the guilt phase of the trial regarding Shadai's enlarged and injured vaginal and rectal openings, evidence that she was sexually abused. This testimony was allowed to rebut the theory of accident presented by Lester concerning Shadai's broken leg, pursuant to Miss. R. Evid. 404(b). "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Miss. R. Evid. 404(b). Such evidence may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. The defense had only questioned witnesses on a theory of accident for Shadai's broken femur, not for her death; therefore, this evidence should not have been included under Rule 404(b).

¶72. Moreover, no evidence was ever presented at his trial showing that Lester was the person who committed the sexual abuse. The sexual abuse had occurred at least two to three weeks before Shadai's death and was not a contributing cause of death. The State was only able to show that Lester had the opportunity to commit the abuse. We have previously held that evidence of prior acts or offenses used to rebut a theory of accident will only be admissible if there is proof that the defendant committed those prior offenses. *Hawkins v. State*, 80 So.2d 1 (Miss. 1955). *See also Huddleston*, 485 U.S. at 685, 689-92. While we have determined that evidence of prior acts of abuse may be admitted to show a pattern of child abuse and refute a defense theory of accident, we have also held that the admissibility of such evidence is subject to proof that the defendant committed the prior acts of abuse. *Cardwell*, 461 So.2d at 760. Since no evidence was presented at trial to show that Gerry Lester was the one who sexually abused Shadai, this evidence should never have been admitted, even to rebut the theory of accident.

¶73. During closing arguments in the guilt phase, the prosecution focused on the evidence of sexual abuse to convince the jury that Lester should be found guilty. Then, during closing argument in the sentencing phase, the prosecution focused on the inadmissible evidence of sexual abuse to convince the jury that Lester should be sentenced to death. Assistant District Attorney Speetjens argued that the sexual abuse was evidence of the "heinous, atrocious or cruel" aggravating circumstance. Even if the sexual abuse was properly admitted to refute the defense theory of accident, it was clearly misused by the prosecution during closing argument. Such is the danger of admitting highly prejudicial evidence, even with a limiting instruction, which was not given in this case.

¶74. It certainly cannot be said that the probative value of this evidence outweighed its prejudicial effect. Miss. R. Evid. 403 requires a balancing of probative value versus unfair prejudice before evidence is admitted under Rule 404(b) to refute accident. As previously stated, child sex abuse carries an obvious stigma so that evidence of Shadai's sexual abuse was particularly damaging to Lester. This evidence was highly prejudicial, and should have been excluded by the trial court.

### H.

### Closing Argument--Sentencing Phase

¶75. Lester also points out other evidence that he argues was used improperly by the prosecutor during closing argument in the sentencing phase. Ms. Speetjens properly used the evidence that Lester failed to report to his probation officer during her closing argument at sentencing to attack Lester's credibility. Similarly, the prosecution appropriately used evidence of Percy and Annie Lester's bias toward their sons in the face of their felony convictions to impeach Percy and Annie Lester's credibility. Finally, the prosecutor's comments on Lester's spending money on beer instead of his children was properly used to argue that Lester's mitigation evidence should be given little weight. Attorneys are given broad latitude in framing closing arguments so long as they don't argue any impermissible factor. *Neal v. State*, 451 So.2d 743, 762 (Miss. 1984). The prosecution did not improperly use any of this evidence during closing argument in the sentencing phase, so we refuse to reverse based upon this sub-issue.

### I.

### Conclusion

¶76. "Incompetent evidence, inflammatory in character, when presented to a jury carries with it a presumption that it was harmful." *McDonald v. State*, 285 So.2d 177, 179 (Miss. 1973). In the case *sub judice*, the prosecution inserted irrelevant, highly prejudicial evidence and argument, which the trial court erroneously admitted. The combined effect of the improper use of bad character and bad acts evidence by the prosecution in this case, as set out in subparts E, F, and G of this issue, constitutes reversible error.

### VII.

### THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S OBJECTION TO TESTIMONY FROM RUCHELLE SANDERS, THE VICTIM'S MOTHER, ABOUT GERRY LESTER'S ALLEGED ASSAULTS ON RUCHELLE WHILE SHE WAS

**PREGNANT.**

¶77. During redirect of Ruchelle Sanders, the prosecutor elicited the following testimony concerning fights between Gerry and Ruchelle over Lester's objection:

> Q. Tell them what the fights were about.
>
> A. The fights were about when--one night when I came from work, I had told him what time to pick me up, and when he came I wasn't there. I had walked home, most of the way home. I caught a ride part of the way. By the time I got there, I was tired. He came in there calling my name. When he called my name, then I answered. Then he asked me why did I leave work, why didn't I wait for him. And I told him cause he took so long because it was an hour and a half that I had waited. And so he started hitting on me and kicking me in my stomach, and at this time he knew I was pregnant**.**

It was error for the trial court to admit evidence of a prior assault not connected with the crime charged, having the effect of portraying Lester as a violent man. *See **Buchanan v. State***, 37 So.2d 318, 318 (Miss. 1948) (improper for prosecutor to ask questions concerning prior assault with the effect of portraying defendant as violent and quarrelsome); ***Herman v. State***, 22 So. 873, 873-74 (Miss. 1898) (error for trial court to admit evidence of a prior assault by the defendant); ***Raines v. State***, 33 So. 19, 20-21 (Miss. 1902) (evidence of prior abusive acts unconnected with the crime charged was incompetent and irrelevant); Miss. R. Evid. 404(b). Similarly, the prosecutor erred in questioning Lester himself about this incident.

¶78. The State argues that Lester opened up this line of questioning during cross-examination of Ruchelle Sanders. However, the record reflects that the defense attorney was merely questioning Ruchelle as to why she never made Gerry leave, and Ruchelle responded that she was afraid to, because Gerry beat her. The trial court erred in allowing further irrelevant, prejudicial evidence of these fights to be admitted.

## VIII.

### THE COURT ERRED IN ADMITTING HEARSAY EVIDENCE.

¶79. Lester next assigns as error the improper admission of hearsay evidence at his trial. Over Lester's objection, Ruchelle was allowed to testify that the social worker, Ms. Mullins, had used the word "abuse" in discussing Shadai's broken femur. While this testimony may have amounted to hearsay under Miss. R. Evid. 801 and 802, no harm resulted in light of the overwhelming evidence that Shadai was a victim of child abuse.

¶80. Lester points to other testimony which he unsuccessfully argues was inadmissible hearsay. Dr. Donaldson and Dr. Woodall both testified that Shadai's injuries had been reported to DHS as suspected child abuse. Similarly, Dr. Blumenthal testified that he had reported to others in the emergency room that Shadai's case involved abuse. This was proper testimony regarding the procedure followed in suspect child abuse cases, following the doctors' challenged expert opinions that Shadai was a victim of abuse. A witness's own statement may be admitted at trial to show that it is consistent with his testimony to rebut any implied charge that the testimony is inaccurate. Miss. R.

Evid. 801(d)(1)(B). Furthermore, even if these statements were hearsay, they could have been properly admitted as statements for purposes of medical diagnosis or treatment. Miss. R. Evid. 803(4).

¶81. Lester also claims that Michelle Martin's testimony that she told Ruchelle that she didn't believe Gerry's story that Shadai had fallen and hurt her lip, and that Ruchelle should get Shadai away from Gerry when she saw Shadai's cut and swollen lip was hearsay. However, this testimony could have been admitted under the present sense impression exception to the hearsay rule. Miss. R. Evid. 803(1). Lester's claim that testimony regarding Shadai's fearful reactions to Gerry Lester were implied hearsay is similarly unfounded. Nonverbal conduct can only be hearsay if it is intended to be an assertion, such as pointing to someone. Miss. R. Evid. 801(a)(2), Comment. Shadai's conduct around Lester cannot be said to have been assertive. This Court has never held, and we do not hold today that conduct of a baby is implied hearsay. Furthermore, Lester raised no objection to the testimony of Shadai's conduct around Lester, so this issue is barred on appeal. *See Carr*, 655 So.2d at 853.

## IX.

### THE COURT ERRED IN ADMITTING INADMISSIBLE OPINION EVIDENCE.

**¶82.** Over objection, the prosecutor asked Ruchelle Sanders, "Do you have any knowledge as to what, if any, actions that the Department of Human Services did with respect to Ms. Gillom after it turned out he was charged with murdering your baby?" Ruchelle's response was that she never saw Ms. Gillom again, but saw another social worker instead. Lester's objection was sustained, but only after Ruchelle had already responded. Also over objection, Ruchelle testified that Shadai acted like she didn't want to stay with Gerry Lester after her leg was broken. In response to the prosecutor's question about why Dr. Donaldson remembered Shadai's case, Dr. Donaldson replied, over objection by Lester, that the case stuck in his mind, because "you hate to think that such a thing is possible, and you look for any possible reason. . . .that possibly explains it." Dr. Donaldson further testified, over objection, that the investigation by DHS which treated Shadai's case as child neglect, instead of abuse, was "inadequate." Finally, Lester points again to Michelle Martin's testimony that she did not believe Lester's explanations for Shadai's injuries.

**¶83.** Lester asserts that these pieces of testimony were all inadmissible opinion evidence. He claims that Dr. Donaldson's testimony regarding the investigation by DHS was outside his field of expertise. However, Dr. Donaldson was allowed to testify as an expert on child abuse, so his opinion regarding the inadequacy of DHS's investigation into possible child abuse was clearly within the scope of his field of expertise.

¶84. Lester points to *Rose v. State*, 556 So.2d 728, 731-33 (Miss. 1990), in support of his contention that Michelle Martin's testimony was improper opinion evidence on Lester's truthfulness. In *Rose*, this Court held that the opinion of an officer that three co-defendants were telling the truth was inadmissible, because it was more prejudicial than probative, and it was not based on first-hand knowledge. *Id*. at 733. Miss. R. Evid. 701 allows lay witnesses to testify as to their opinions if based upon their own perception if the evidence is helpful to the jury. In this case, Michelle Martin's testimony was not offered to attack Lester's general believability, and her opinion was based upon her first-hand knowledge as a mother and her first-hand impression after seeing Shadai's injuries.

Therefore, her testimony was not improper opinion evidence. Ruchelle's testimony regarding Shadai's reaction to being left with Gerry Lester was similarly based upon her own perception, and was therefore properly admitted.

¶85. Ruchelle never specifically stated that Ms. Gillom was fired or removed from the case after Lester was charged with murder. She therefore cannot be said to have offered her opinion on the matter. Furthermore, Lester's objection was sustained, thereby curing any error in the prosecutor's question. *See Foster*, 639 So.2d at 1282.

**¶86.** No improper opinion evidence was admitted by the trial court in this case. As a result, we do not reverse based upon this assignment of error.

## X.

### THE CUMULATIVE EFFECT OF IRRELEVANT PREJUDICIAL EVIDENCE WARRANTS REVERSAL.

¶87. Lester asserts that Dr. Woodall's testimony that an IV was inserted into Shadai's bone during treatment on the night of her death was irrelevant, prejudicial evidence. However, this evidence was relevant to show all of the procedures which were used by the hospital to treat Shadai's fatal injuries. No error occurred by admitting Dr. Woodall's testimony.

¶88. Over Lester's objection, Kendrick Sanders was allowed to testify that he and his mother, Ruchelle, had held Shadai in the hospital after her death. Kendrick further testified over the same objection that he had visited Shadai's grave and taken flowers to her grave. This testimony regarding events occurring after Shadai's death had absolutely no relevance in determining whether Lester was guilty of capital murder. This evidence worked only to invoke sympathy toward the victim's family, and had no place in the guilt phase of trial. *See Clark v. Commonwealth*, 833 S.W.2d 793, 796-97 (Ky. 1991). It otherwise created unfair prejudice in violation of Miss. R. Evid. 403. Therefore, the trial court erred in allowing this testimony over Lester's objection. Admission of this evidence contributed to the reversible error resulting from the combined admission of other incompetent, highly prejudicial evidence which was erroneously admitted at Lester's trial.

## XI.

### THE TRIAL COURT ERRED IN NOT ADMITTING THE FULL TEXT OF EXHIBITS E AND F, LETTERS FROM LESTER TO SANDERS.

¶89. Lester next cites as error the trial court's refusal to admit the entire text of two letters written by Lester to Ruchelle Sanders, after the prosecutor used part of the letters in cross-examining Gerry Lester, Brenda Lester, and Carl Jacobs. Lester asserts that the trial court violated Miss. R. Evid. 106 by failing to admit the entire letters. However, Rule 106 only requires admission of an entire writing after part of it has been introduced into evidence by the opposing party. There is a difference between introducing a document into evidence and questioning a witness about the document. Here, no part of Lester's letters were offered into evidence, so the doctrine of completeness in Rule 106 does not apply. The trial court did not err, therefore, in refusing to admit the entire letters written by Lester.

## XII.

## THE PROSECUTION'S DELIBERATE FAILURE TO PROVIDE DISCOVERY WARRANTS REVERSAL.

¶90. Lester next argues that failure of the prosecution to provide letters written by him to Ruchelle Sanders to the defense attorney was a clear discovery violation, and since a short continuance would not have cured the error, that the case should be reversed. *See West v. State*, 553 So.2d 8, 17-20 (Miss. 1989) (holding that a day's break was inadequate to cure prosecution's failure to disclose expert's surprise testimony regarding necrophilia). It is true that the prosecutor in this case violated discovery in his failure to provide the defendant with the letters from Lester to Ruchelle Sanders. At the time of Lester's trial Miss. Unif. Crim. R. of Cir. Ct. Prac. 4.06 (i) (codifying the guidelines set out by this Court in *Box v. State*, 437 So.2d 19, 23-24 (Miss. 1983)) was the applicable rule for analyzing discovery violations; URCCC 9.04(I) now applies to discovery violations. *See Ross v. State*, 603 So.2d 857, 862 (Miss. 1992). The rules require that the trial court grant the defense reasonable time to examine new evidence that the prosecution attempts to introduce at trial without prior disclosure. If the defense still shows unfair surprise or prejudice and requests a continuance or mistrial, the trial court must either exclude the evidence or grant a continuance. Miss. Unif. Crim. R. of Cir. Ct. Prac. 4.06 (i); URCCC 9.04(I). Lester moved for a mistrial upon finding that eighteen other letters from Lester to Ruchelle Sanders existed. The trial court denied his motion for a mistrial, but ordered that all of the letters be given to the defense counsel during a short recess and offered a recess for the remainder of the day for the defendant to have time to read the letters. Defense counsel Mr. Malouf declined the recess, but agreed to read the letters overnight. Allowing the defendant overnight to examine the letters was sufficient time for the defense to meet any evidence presented from the letters. The prosecution violated discovery by failing to produce the letters before trial, but the trial court properly followed the rules in addressing the discovery violation, so no reversible error occurred.

## XIII.

## THE TRIAL COURT ERRED IN OVERRULING LESTER'S OBJECTION TO THE PROSECUTOR'S UNSWORN TESTIMONY THAT HIS OFFICE HAD NOT DENIED LESTER A POLYGRAPH.

¶91. During redirect examination of Dr. O'Brien, the doctor testified that Lester had told him that he would be willing to take a polygraph exam. Then during recross-examination, the prosecutor asked Dr. O'Brien whether the District Attorney's Office had refused Lester's request for a polygraph exam. The doctor replied that he didn't know anything about it. When defense counsel further questioned O'Brien about Lester requesting a polygraph exam, both prosecutors stated that they had no knowledge of any polygraph exam, and Mr. Peters said that they denied any allegation of refusing Lester the opportunity to take a polygraph. The trial judge then instructed the jury to disregard all of this testimony about Lester's offer to take a polygraph exam.

¶92. Lester now argues that it was improper for the trial judge to overrule his objection to the prosecutors' statements and to instruct the jury to disregard the testimony that Lester offered to take a polygraph exam. He cites *Conner v. State*, 632 So.2d 1239, 1258 (Miss. 1993), in support of his contention that evidence of a witness's offer to take a polygraph exam is admissible. However, in *Conner*, this Court stated that evidence of an offer to take a polygraph is only admissible to support

the credibility of a witness whose veracity has previously been attacked. *Id*. Since Gerry Lester had yet to take the witness stand when Dr. O'Brien was testifying, he had not yet been impeached, and evidence that Lester had offered to take a polygraph exam was therefore inadmissible. It was not error for the trial judge to instruct the jury to disregard any such testimony. The trial court's instruction for the jury to disregard the prosecutors' statements was sufficient to cure any error caused by their outburst. *See Johnson*, 475 So.2d at 1142. No reversible error resulted, and we do not reverse based upon this assignment of error.

## XIV.

### THE TRIAL COURT ERRED IN DENYING INSTRUCTION NUMBER D-9 WHICH EMBODIED A THEORY OF DEFENSE.

¶93. Instruction D-9 as submitted by the defendant read in its entirety:

> One of the issues in this case is the identification of the defendant as the person who allegedly committed the crime charged in the indictment. In addition to the elements of the crime itself, the prosecution also has the burden of proving identity of the defendant as the perpetrator of the crime charged, beyond a reasonable doubt, before you may find him guilty. *If after considering the testimony you have a reasonable doubt as to the accuracy of the identification, you must find the Defendant not guilty.*

In response to the prosecutor's objection to this instruction for lack of basis in the evidence, the trial judge decided to give the instruction after striking the final sentence.

¶94. Lester argues that by deleting the final sentence, the trial judge gave an abstract instruction which denied Lester his theory of defense that Lester was not the person who committed the murder. Lester is correct in stating that he is entitled to have his defense theory presented to the jury within the court's instructions. *See Sayles v. State*, 552 So.2d 1383, 1384 (Miss. 1989). However, the instruction as given was not abstract and was adequate to instruct the jury on Lester's defense theory that the prosecution had failed to prove beyond a reasonable doubt that Lester was the perpetrator of the crime. The final sentence referred to the accuracy of an identification; since there was no evidence of an identification presented at trial, this sentence would have only confused the jury. The trial judge, therefore did not err in deleting the final sentence of Instruction D-9, and we do not reverse Lester's conviction and sentence based upon this assignment of error.

## XV.

### THE OVERLAP BETWEEN SECTION 97-3-19(2)(f) AND 97-3-27 GIVES PROSECUTORS AND JURIES UNFETTERED DISCRETION TO IMPOSE EITHER THE DEATH PENALTY OR CONVICT OF MANSLAUGHTER AND VIOLATES THE EIGHTH AMENDMENT AND CORRESPONDING SECTIONS OF THE MISSISSIPPI CONSTITUTION.

¶95. It is Lester's position that Mississippi's sentencing system, as applied to killings in the course of felonious child abuse, violates the principles enunciated in *Godfrey v. Georgia*, 446 U.S. 420 (1980) and *Furman v. Georgia*, 408 U.S. 238 (1972), and thus is unconstitutional. Lester was convicted for

killing during the commission of felonious child abuse under Miss. Code Ann. § 97-3-19(2)(f). Section 97-5-39(2) defines felonious child abuse as the intentional burning, torturing, or abuse of a child so as to cause serious bodily harm, unless done in self-defense or defense of another. Miss. Code Ann. § 97-5-39(2). According to Lester, upon proof of the exact same factual elements, he could have been convicted of manslaughter under Miss. Code Ann. § 97-3-27. At the time of Lester's trial, that statute read as follows:

> The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

Miss. Code Ann. § 97-3-27.[1] Because these statutes overlap, Lester maintains that unfettered discretion is granted to the prosecutor in the choice of offenses to prosecute and/or the jury in the choice of offenses on which to convict, and this discretion is forbidden by *Furman.*

¶96. Lester failed to raise this issue before the trial court; therefore it is procedurally barred on this appeal. *See Carr*, 655 So. 2d at 853. Without waiving any procedural bar, Lester's argument is unpersuasive. *Furman* demands a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313. According to *Godfrey* death sentences cannot be imposed in an uncontrolled, standardless, and unchanneled manner. *Godfrey*, 446 U.S. at 420. Mississippi's capital sentencing scheme satisfies these requirements, and despite Lester's assertion to the contrary, it prevents the unfettered application of the death penalty.

¶97. This Court recently rejected this same argument as applied to Miss. Code Ann. § 99-3-19(2)(e) in *Blue v. State*, 674 So.2d 1184, 1205-1207 (Miss. 1996). In that case, the defendant unsuccessfully argued that the overlap between Miss Code Ann. §§ 99-3-19(2)(e) and 97-3-27 violated the Constitutions of the United States and Mississippi. This Court ruled that Blue's argument failed for two reasons. "First, it is well established that where there are two separate criminal statutes for the same offense, the State has a choice of deciding under which statute it will proceed, as long as the State clearly sets forth in the indictment under which statute it is proceeding." *Id*. at 1206-1207. (citing *Butler v. State*, 608 So.2d 314, 320 (Miss.1992); *Rowland v. State*, 531 So.2d 627, 631-32 (Miss.1988); *Cumbest v. State*, 456 So.2d 209, 223 (Miss.1984)). Second, this Court found that the additional guidelines set out in Miss. Code Ann. § 99-19-101 prevented "total unguided discretion" by the jury in choosing whether to impose the death penalty. *Id*. at 1207. Before imposing the death penalty, § 99-19-101(7) requires the jury to first determine one or more of the following:

> (a) The defendant actually killed;

> (b) The defendant attempted to kill;

> (c) The defendant intended that a killing take place;

> (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7). After making this determination, the jury must then weigh the

aggravating and mitigating circumstances as prescribed in Miss. Code Ann. § 99-19-101(2) and (3) (c). This Court determined in *Blue* that this two-step statutory process required before imposing the death penalty prevents arbitrariness in the statutory overlap of §§ 97-3-19(2)(e) and 97-3-27. Therefore, the same conclusion must be reached regarding the overlap of §§ 97-3-19(2)(f) and 97-3-27. Lester's argument on this point is both meritless and procedurally barred, and we do not vacate Lester's sentence on this ground.

## XVI.

## THE INSTRUCTIONS FAIL TO ADEQUATELY INFORM THE JURY OF ITS OPTIONS TO FIND MANSLAUGHTER.

¶98. The trial court granted Lester's Instructions D-12, D-14, and D-17 on manslaughter. Instruction D-12 informed the jury of their option to find Lester guilty of manslaughter and defined manslaughter as "the killing of another person without malice aforethought or premeditation, but by acts of culpable negligence while in the process of another felony such as child abuse." Instruction D-14 defined culpable negligence as "the conscious and wanton disregard of the probabilities of fatal consequences to others as a result of the wilful creation of an unreasonable risk thereof." Instruction D-17 allowed the jury to find Lester guilty of capital murder, guilty of manslaughter, or not guilty.

¶99. Lester claims that his right to have the jury fully instructed on manslaughter as set out in *Butler v. State*, 608 So.2d 314, 319-320 (Miss. 1992), was denied by the trial court's refusal to give Instruction D-13. Instruction D-13 read as follows:

> If you find beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant, GERRY LYNN LESTER, did cause the death of Tifinay Nicole Shadi Sanders, but that the same was not done with premeditation or malice aforethought but was done in by an act of culpable negligence, then you shall find the Defendant, GERRY LYNN LESTER, guilty of manslaughter.

¶100. In *Butler* this Court determined that a capital murder defendant who could be convicted under either Mississippi's capital murder statute or Mississippi's manslaughter statute was entitled to have the jury instructed as to both crimes. *Butler*, 608 So. 2d at 320. The statutes at issue in *Butler* were the same statutes at issue in this case--Miss. Code Ann. §§ 97-3-19(2)(f) and 97-3-27. In *Butler*, the trial court gave an instruction on heat of passion manslaughter, but did not give an instruction on manslaughter under § 97-3-27. *Id*. at 319-20. This Court held that the jury should have been instructed on § 97-3-27 manslaughter, which has the same elements as § 97-3-19(2)(f), except that the capital murder statute includes the element of intent to kill which is lacking in the manslaughter statute. *Id*.

¶**101.** Lester's argument must fail, because the combination of Instructions D-12, D-14, and D-17 was sufficient to instruct the jury on their option to find Lester guilty of § 97-3-27 manslaughter. Instruction D-12's definition of manslaughter mirrors the definition of manslaughter in § 97-3-27. Instruction D-13 was not necessary to complete the jury instructions on manslaughter. Therefore the *Butler* requirement of instructing the jury on manslaughter was satisfied by the trial court's instructions as given. We do not reverse based upon this assignment of error.

## XVII.

### THE JUDGE COMMITTED REVERSIBLE ERROR IN OVERRULING LESTER'S OBJECTION TO THE JURY INSTRUCTION WHICH OMITTED INTENT FROM THE ELEMENTS OF THE CHARGE ON CHILD ABUSE.

¶**102.** Lester asserts that Instruction S-1 failed to instruct the jury that it must find that Lester intentionally caused injuries to Shadai in order to hold that Lester committed felonious child abuse. Instruction S-1 did require the jury to find that Lester "did wilfully, unlawfully, and feloniously engage in the commission of felonious abuse and/or battery of Tiffany Nicole Shadai Sanders." Lester argues that this instruction omitted the element of intent from the charge of felonious child abuse, thus allowing the jury to find that Lester was guilty of child abuse if he negligently caused the injuries to Shadai.

¶103. This argument fails by common sense analysis. The instruction does require finding that Lester "wilfully" caused the injuries in order to hold that he committed felonious child abuse. "Wilfully or willfully" and "intentionally" have the same meaning, both in ordinary understanding and as legal terms. Black's Law Dictionary defines "willful" as "Proceeding from a conscious motion of the will; voluntary; knowingly; deliberate. *Intending* the result which actually comes to pass; designed; *intentional*; purposeful; not accidental or involuntary." Black's Law Dictionary 1599 (6th ed. 1990) (emphasis added). Black's defines "intentionally" in part as "For purposes of criminal statute means *willfully* or purposely, and not accidentally or involuntarily." Black's Law Dictionary 810 (6th ed. 1990) (emphasis added) (citations omitted). Webster's defines "**willful** *or* **wilful**. . . .2: done deliberately: not accidental or without purpose: intentional. . . ." Webster's Third New International Dictionary 2617 (1986). "[S]ynonymous phrases or interchangeable words may be used in a jury instruction and the jury still be properly instructed." ***Lancaster v. State***, 472 So.2d 363, 367 (Miss. 1985) (citing ***Erving v. State***, 427 So.2d 701, 703-705 (Miss.1983)). Since the two words are synonymous, no error occurred in substituting "wilfully" for "intentionally" in the jury instructions. The required element of intent was given as part of the jury instruction on felonious child abuse in Instruction S-1. Therefore this assignment of error is without merit.

## XVIII.

### THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO GIVE THE INSTRUCTION REQUESTED BY THE DEFENSE DEFINING CHILD ABUSE AND CHILD NEGLECT.

¶104. Lester next complains that the trial court erred in refusing to give jury instructions defining child abuse and child neglect. As previously discussed, the trial court did in fact give adequate jury instructions on the elements of felonious child abuse. Lester further argues that the trial court erred in denying Instruction D-19 which defined child neglect, and required the jury to find Lester not guilty if they determined that he committed child neglect and not child abuse. Lester alleges that by refusing this instruction, he was denied his theory of defense that Lester did not intentionally cause the spiral fracture in Shadai's leg or her busted lip. Again, Lester correctly states that Mississippi law requires that his defense theory be presented to the jury within the court's instructions. ***See Sayles***, 552 So.2d at 1384. However, in this case, the trial court properly denied Instruction D-19, because child neglect had nothing to do with Shadai's death, and an instruction on child neglect would only have confused

the jury.

¶105. While some confusion may have resulted from Dr. Blumenthal's medical definition of child abuse as including child neglect, the trial court properly instructed the jury on the definition of child abuse. A jury is presumed to follow the instructions of the trial judge, so any confusion which may have been caused by Dr. Blumenthal's testimony was effectively cured by the court's instructions. *See Johnson*, 475 So.2d at 1142. Lester was charged with capital murder during the course of felonious child abuse. The jury was properly instructed to find Lester not guilty if they found that Lester did not commit felonious child abuse. Reading the instructions as a whole, no error therefore resulted in denying Instruction D-19 on child neglect. This issue is without merit and is not grounds for reversal.

## XIX.

### THE TRIAL COURT ERRED IN OVERRULING LESTER'S CHALLENGES FOR CAUSE TO SEVERAL JURORS.

### A.

### Juror Hubert Lewis

¶106. Lester first claims that his challenge for cause of Juror Hubert Lewis should have been sustained, because Lewis leaned toward the death penalty in cases involving children. However, Lester takes Lewis's comments out of context. In reading the entire record, it is obvious that Lewis was simply being honest about his feelings toward the death penalty, particularly in child murder cases, before he had any knowledge about the sentencing process. Once Lewis was informed about the separate sentencing phase, he stated that he would be able to follow the judge's instructions, regardless of his prior feelings, and base his decision on the evidence, requiring the State to prove their burden of proof and weigh the mitigating and aggravating circumstances. When asked by the defense whether he would lean toward the death penalty instead of life imprisonment, Lewis replied that he would first have to hear the evidence. Juror Lewis stated that he would set aside his personal feelings and follow the law as instructed by the trial judge. This Court has previously held that jurors who leaned heavily toward the death penalty but "could put aside their personal feelings, follow the law and instructions of the court and return a verdict based solely upon the law and the evidence and not vote for the death penalty unless the evidence warranted it" were qualified to serve. *Leatherwood v. State*, 435 So.2d 645, 654 (Miss. 1983). The trial court properly refused to grant Lester's challenge for cause to Lewis.

¶107. Furthermore, Lester had the opportunity to peremptorily strike Juror Lewis, because the defense had four remaining peremptory challenges when Lewis was tendered.

> Denial of a challenge for cause is not error where it is not shown that the defense has exhausted peremptory challenges and is thus forced to accept the juror. This threshold test is applicable in a capital murder case. A prerequisite to a claim that the trial court erroneously forced a defendant to accept an incompetent juror is exhaustion of peremptory challenges.

*Berry v. State*, 575 So.2d 1, 9 (Miss. 1990) (citing *Rush v. State*, 278 So.2d 456, 458 (Miss. 1973); *Billiot v. State*, 454 So.2d 445, 457 (Miss. 1984); *Chisolm v. State*, 529 So.2d 635, 639 (Miss.

1988)). Because Lester failed to use a peremptory challenge to excuse Juror Lewis, and because the record reflects that Juror Lewis was qualified to serve, this assignment of error must fail.

## B.

### Juror James Busby

¶108. Lester next asserts that the trial court erred by failing to excuse Juror James Busby for cause, because Busby had been a victim of crime, was related to law enforcement personnel, had previously heard about the case, and was a supporter of the death penalty. Lester had no remaining peremptory challenges when Busby was tendered to the defense, and Busby ended up serving as the foreman of the jury.

¶109. All of Busby's relatives in law enforcement were all from Lauderdale County and are deceased. Lester's case had little to do with law enforcement anyway, since the majority of the testimony was from medical experts, not law enforcement officials. Although he said that he had read about the case when it happened, Busby could not remember anything specific about it and had not formed any opinion as to Lester's guilt or innocence. While Busby was a crime victim, courts would be hard-pressed to find people in Hinds County these days who have not at one time or another been victims of crime. Furthermore, Busby believed that these crimes would have no bearing on his decision as a juror.

¶110. Busby did state that he was in favor of the death penalty, both in his juror information questionnaire and during voir dire. However, when further questioned about his position on the death penalty, Busby stated that he would not automatically vote for the death penalty and would be willing to hear all of the evidence first. When asked if he would set aside his personal views and listen to and weigh the evidence of mitigating and aggravating circumstances, Busby responded, "Yes, sir, I would do that." He further clarified that when he said, "I'll try my best to do that" (follow the law), he meant that he would be able to succeed. While it is true that this Court has previously held that it is not enough for a potential juror to say that she would "try" to follow the court's instructions, Mr. Busby in this case stated that by trying he would in fact succeed. ***Billiot***, 454 So.2d at 457. When people say "I'll try" or "I think I could" do something, it doesn't necessarily mean that they doubt their own ability. The person's tone of voice, facial expression, and general demeanor affect the meaning which these phrases would carry. That is exactly why a trial judge's decision on whether to excuse a juror is given wide discretion. ***See Scott v. Ball***, 595 So.2d 848, 849 (Miss. 1992) (citations omitted). The trial court found that Juror James Busby was only being honest with the court and was an acceptable juror. It cannot be said that the trial court abused its discretion in refusing to excuse Juror James Busby for cause.

## C.

### Failure to Excuse Additional Jurors for Cause

¶111. None of the remaining jurors whom Lester argues should have been excused for cause ended up on the jury, because Lester was able to use his peremptory challenges to excuse them. Since Lester was not forced to accept any of these jurors, he is barred from raising this issue on appeal. ***See Berry***, 575 So.2d at 9. Aside from Lester not meeting this prerequisite, the trial court properly

declined to excuse these jurors for cause.

### 1. Benjamin Harper, Jr.

¶112. Lester again claims that being a crime victim somehow prevents a juror from being acceptable to serve, but cites no authority for this position. Although Harper had previously served on juries in two capital cases and voted for the death penalty, he stated unequivocally that his experience on those two cases would not cause him to lean toward the death penalty in this case.

### 2. Sharon Stone Dorman

¶113. Lester claims that Ms. Dorman never clearly stated that she would not lean toward the death penalty. He also asserts that because of her having worked with children and being a mother, Ms. Dorman would have used the fact that the victim in this case was a small child as a non-statutory aggravating circumstance. However, the record reflects that Dorman stated that she would not lean toward the death penalty, would consider all evidence, and would weigh the aggravating and mitigating circumstances before voting during sentencing. Ms. Dorman also stated that her experience in having worked with children and parents would make her a fair juror toward Lester.

### 3. Mrs. Lydumah Ratliff

¶114. Lester asserts that because Mrs. Ratliff initially stated that she would lean toward the death penalty where a child was involved, she was an unqualified juror. Again, so long as a juror can set aside her personal feelings toward the death penalty and follow the law, she is an acceptable juror. *See Leatherwood*, 435 So.2d at 654. Ms. Ratliff stated that her vote would not be automatic, she would weigh the mitigating and aggravating circumstances, and she would have to be "thoroughly convinced" of guilt before voting for the death penalty. Ms. Ratliff stated that she could accept the law as she had learned it since arriving for jury duty and would follow the law as the court explained it to her.

### 4. Mary Williams Blackmon

¶115. Lester complains that Ms. Blackmon should have been excused for cause, because she had two friends on the Jackson Police Department, had two sisters who were rape victims, favored the death penalty in cases involving children, and had two children who were previously treated by one of the prosecution's witnesses, Dr. Donaldson. Blackmon stated that neither knowing the police officers nor having sisters who were rape victims would influence her decision. Ms. Blackmon also stated several times that she would be fair and follow the law; she would need to hear all of the evidence before deciding whether to vote for the death penalty. Although Dr. Donaldson had treated her children previously, it had been seven to eight years since she had taken them to see Dr. Donaldson, and she stated that she would not place more emphasis on his testimony than the testimony of the other experts. Lester points to *Scott v. Ball*, 595 So.2d 848, 848-50 (Miss. 1992), to support his contention that Ms. Blackmon should have been excused because her children were treated by Dr. Donaldson. However, in that case a potential juror's family members had been treated by the doctor who was the defendant in the medical malpractice case for which the potential juror had been called. *Id*. In the present case, Dr. Donaldson was not a party, but a mere witness.

### 5. Ms. Betty Jane Tatum Robb

¶116. Lester asserts that Ms. Robb should have been excused for cause because she stated that she had previously heard about the case and would have difficulty separating the facts which she had heard before from the evidence presented at trial. However, upon further questioning it turned out that Ms. Robb had Lester's case confused with another case. Ms. Robb also stated that she would not be influenced by what she had read.

¶117. Lester argues that Ms. Robb was not qualified to serve because she believed that her granddaughter might have been sexually abused as a child. However, Ms. Robb stated that it would not influence her decision, because the situations were different.

### 6. Ms. Julie Kay Musgrove Moore

¶118. Lester claims that the trial court erred in failing to excuse Ms. Moore because of her strong support for the death penalty. However, Ms. Moore stated that she would follow the instructions given by the court. Defense counsel even admitted that Mr. Peters had "somewhat rehabilitated" Ms. Moore as a juror during further questioning in general voir dire. Again, so long as a juror agrees to follow the law as explained in the court's instructions, that juror is qualified to serve, regardless of personal feelings in favor of the death penalty. *See Leatherwood*, 435 So.2d at 654.

### XX.

### THE TRIAL COURT ERRED IN SUSTAINING THE PROSECUTION'S CAUSE CHALLENGE TO JUROR NIMOX.

¶**119.** Lester complains that the trial court erred in excusing Juror Nimox for cause. However, the record reflects that Nimox stated that he could not consider voting for the death penalty under any circumstances. If given a choice, Nimox said he would not participate in voting for the death penalty. He also stated that as a journalist he would have trouble setting aside the opinions which he had already formed regarding the case. It is well settled that a party is not entitled to have any specific venire member on the jury; the requirement is only that the trial court protect the defendant's right to a fair and impartial jury. *Coverson v. State*, 617 So.2d 642, 645-46 (Miss. 1993). Again , trial courts are given wide discretion in deciding whether to exclude jurors for cause. *See Scott v. Ball*, 595 So.2d at 849. It cannot be said that the trial court abused its discretion in excusing Juror Nimox who stated that he could not consider voting for the death penalty and who had a firm prior opinion on Lester's case. This issue is without merit, and we do not reverse based upon Lester's assertions.

### XXI.

### THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE TO JUROR HENRY GREENE.

¶120. Lester also claims that it was error for the trial court to excuse Juror Greene. However, the record reflects that Greene had night jobs which he expected to continue during the trial and so would not be able to give his full attention to the trial. The trial court also based its decision on the fact that Juror Greene had previously experienced minor psychological problems. Lester's argument fails regarding Juror Greene for the same reason that his argument regarding Juror Nimox fails.

Lester was not entitled to have this particular juror try his case, and no abuse of discretion resulted from the trial court's refusal to excuse a juror who admitted that he would have difficulty concentrating on the trial and who had a possible mental problem. This issue is similarly meritless.

## XXII.

## THIS CASE MUST BE REVERSED OR REMANDED BECAUSE THE JUDGE DID NOT REQUIRE THE PROSECUTOR TO GIVE REASONS FOR HIS PEREMPTORY CHALLENGES.

¶121. Lester asserts that during jury selection the prosecutor exercised its peremptory strikes in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that the trial court committed reversible error by failing to compel the prosecution to justify its peremptory strikes as required by *Batson*. Under *Batson*, a challenge to a peremptory strike necessitates a 3-step process. First, the defendant must establish a prima facie case of purposeful discrimination in the selection of jury members. To do this the defendant must show:

1. That he is a member of a "cognizable racial group";

2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and

3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989) (citing *Batson*, 476 U.S. at 96-97; *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987), *cert. denied*, 487 U.S. 1210 (1988)).

¶122. Second, should the defendant make such a showing, the striking party then has the burden to state a racially neutral explanation for the challenged strike. *Batson*, 476 U.S. at 97-98. If a racially neutral explanation is offered the defendant can rebut the explanation. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991) (citation omitted).

¶123. Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination. *Batson*, 476 U.S. at 98. If the defendant makes no rebuttal the trial judge may base his decision only on the reasons given by the State. *Bush*, 585 So. 2d at 1268 (citation omitted). On appellate review this decision is accorded great deference because it is based, in a large part, on credibility. *Lockett*, 517 So. 2d at 1349. "'Great deference' has been defined in the *Batson* context as insulating from appellate reversal any trial findings which are not clearly erroneous." *Id.* at 1349-50 (citations omitted).

¶124. In this case, both Lester and the State made *Batson* challenges at the close of voir dire. Eighty-seven jurors were qualified on the venire: twenty-five were black females, fifteen were black males, twenty-four were white females, and twenty-three were white males. Thus the racial make-up of the original venire was approximately forty-six percent black and fifty-four percent white. The State used nine challenges: three black females, three black males, and three white males. Without considering the effect of the challenges for cause, the prosecution's peremptory challenges would have reduced the percentage of blacks on the venire to forty-four percent, only two percentage points less than the

original venire. Furthermore, the State had three remaining peremptory challenges that went unused; if the intention was to keep black venire members off of the jury, surely these three peremptories would have been so used. The trial court found that based upon these numbers, there was no indication that the State made challenges based upon race and therefore required no explanation of the State's challenges.

¶125. Lester argues that the trial court erred in finding that he failed to make a prima facie case of purposeful racial discrimination by the prosecution in its use of peremptory challenges. He points to *Thorson v. State*, 653 So.2d 876, 895-96 (Miss. 1994), in which this Court remanded the case for a *Batson* hearing, where the prosecution had made seven peremptory challenges against black jurors. However, in *Thorson*, the trial court had erroneously refused to conduct a *Batson* hearing, finding that *Batson* did not apply since the defendant was not part of a minority class. This Court did not remand *Thorson* based upon the number of peremptory challenges used by the prosecution against blacks, but because of the trial court's error in refusing to apply *Batson* at all. Here, a *Batson* hearing was conducted, but the trial court found that Lester failed to establish a prima facie case of racial discrimination by the prosecution's use of peremptory challenges.

¶126. In *Dennis v. State*, 555 So.2d 679, 681 (Miss. 1989), this Court held that the defendant failed to make his prima facie case where the prosecution used five of seven, or approximately seventy-one percent of its peremptory challenges against black jurors. The prosecution in this case used approximately sixty-seven percent of its peremptory challenges against black jurors. Under these circumstances, it cannot be said that the trial judge's ruling that Lester failed to prove his prima facie case under *Batson* was clearly erroneous.

¶127. The trial court made no ruling on the issue of gender-based challenges, because neither party made such a challenge. Because he failed to make a contemporaneous objection at trial, Lester's claim regarding alleged gender-based challenges is barred on appeal to this Court. Aside from the procedural bar, this claim is without merit, because the prosecution used only three peremptory challenges against women and nine against men. Similarly, Lester's claim that the prosecution made race-based challenges for cause is without merit, because *Batson* only applies to peremptory challenges, not challenges for cause. It would be nonsensical to impose the *Batson* inquiry requiring the challenged party to make a showing of race-neutral reasons for its challenges for cause, when obviously such reasons have already been given per the nature of a challenge for cause. The trial judge did not make a clearly erroneous decision in failing to require the prosecution to give reasons for its peremptory challenges, and we do not reverse on this issue.

## XXIII.

### ADDITIONAL PROSECUTORIAL MISCONDUCT DEPRIVED LESTER OF DUE PROCESS AND A FAIR TRIAL.

### A.

### Guilt Phase

¶128. Lester first points to Assistant District Attorney Cynthia Speetjens' statement in closing argument, "So I don't want you to even bother necessarily considering all the State's witnesses who

are so eminently qualified and who are so obviously unbiased. I want you to think about what their witnesses did to this theory." Lester argues that this was an improper personal assurance of the credibility of the State's own witnesses. However, Lester made no objection to this statement at trial, so he is barred from raising it on appeal. *See Carr*, 655 So.2d at 853. Considered on the merits, this claim is unpersuasive. In *Berry*, this Court found no error in the prosecutor vouching for the credibility of one of the State's witnesses, because "broad latitude is afforded the attorneys in closing argument, and the prosecutor did not exceed the limits of argument in this case." *Berry*, 575 So.2d at 9.

¶129. Lester makes the same argument about Ms. Speetjens's statement that she believed Brenda Lester's testimony that Brenda saw no bruises on Shadai before she left Brenda's house on the night of her death. Again this issue is barred for failure to make a timely objection. *See Carr*, 655 So.2d at 853. This comment did not exceed the broad scope that we allow attorneys during closing argument.

¶130. Twice during closing argument, Ms. Speetjens told the jury that if they believed the defense's theory that Kendrick killed Shadai or if they believed Brenda Lester's testimony, they could write down a verdict of not guilty and she would eat it. These comments bordered on the inappropriate, but Lester again failed to make a contemporaneous objection, thus barring this assignment of error. *See Carr*, 655 So.2d at 853.

¶131. Ms. Speetjens again pushed the envelope during closing argument when she asked the jury to remember Ruchelle and Gerry's younger daughter, implying that the other little girl would be in danger if Gerry were acquitted. The trial court sustained Lester's objection and instructed the jury to disregard the comment, thus removing any resulting error. *Foster*, 639 So.2d at 1282**.**

¶**132.** The prosecutor's comments during closing argument regarding Lester's drinking, history of problems in school, responses on Dr. O'Brien's psychological examination, lack of employment experience, and failure to provide support for Ms. Shields's baby were all based in the evidence presented at trial and not objected to at trial. Again, failure to properly object at trial bars consideration of the issue on appeal. *See Carr*, 655 So.2d at 853

¶133. Lester also points to the prosecutor's disparaging remarks and erroneous instructions regarding manslaughter. However, as previously discussed, these comments did not cause reversible error, because the jury was properly informed on its option to find Lester guilty of manslaughter. *Johnson*, 475 So.2d at 1142.

¶134. The trial court sustained Lester's objection to the prosecution's reference to the defense's failure to put an investigator from DHS on the witness stand. Lester incorrectly characterizes this comment as encouraging the jury to infer that the DHS reports contained evidence of Lester's guilt after the court sustained the prosecution's objection to their admission. The record reflects only a comment on the fact that no investigator from DHS ever testified. This statement was not so egregious as to warrant further consideration by this Court after the defense objection was sustained and the jury instructed to disregard the comment.

¶135. Without any objection by Lester, Mr. Peters contrasted the protection of Lester's rights at the trial with Shadai lying in the cold ground. This Court has previously held that it is error to weigh the value of the defendant's life against that of the victim during the sentencing phase. *Willie v. State*,

585 So.2d 660, 679 (Miss. 1991). However, lack of a contemporaneous objection bars further consideration by this Court.

¶136. Lester next asserts that the prosecutor improperly commented that the jury in the end got "the whole picture," implying that the defense was unethical in hiding evidence from the jury. The record reflects no implication by the prosecutor that the defense attempted to hide any evidence from the jury. This argument is therefore without merit.

## B.

### Sentencing Phase

¶137. Lester finally points to the prosecutor's arguments that the jury would "have to go to the moon not to find that this child's soul demands this level of justice" and "This child's soul says: What are you going to do about me? It is extremely tragic that you are what she has on this earth." Lester's objection to this final comment was sustained, so the error in the prosecutor's argument was cured. *See Foster*, 639 So.2d at 1282**.** The "go to the moon" remark may not have been decorous, but it was a fair comment on the weight of the evidence against Lester. The prosecutor did not exceed the boundaries allowed by this Court on closing argument, so we do not reverse based upon this issue.

## XXIV.

### THE VERDICT OF GUILT IS SUPPORTED BY INSUFFICIENT CREDIBLE EVIDENCE.

¶**138.** Lester claims that the prosecution's evidence failed to exclude every reasonable hypothesis consistent with innocence, and that therefore, the jury's guilty verdict is not supported by sufficient credible evidence. Specifically Lester asserts that the prosecution failed to exclude the possibility that someone else committed this crime. Lester argues that the most likely time for the crime to have occurred was between 4:30 p.m. and 6:30 p.m., during which Lester was not alone with Shadai. However, no one was alone with Shadai between 4:30 and 6:30. The expert testimony showed that Shadai could have bled to death within thirty minutes, placing the time of injury at a point when Lester could easily have been alone with Shadai at the apartment. Moreover, the undisputed testimony of all of the experts was that Shadai would not have eaten anything after sustaining her fatal injuries. Since food was found in Shadai's stomach, and Kendrick testified that Shadai ate with him at Brenda's house, the jury could have easily concluded that Shadai's fatal injuries would have to have been committed after leaving Brenda's house. Again that would leave Lester as the most likely suspect.

¶139. It is true that the prosecution bears the burden in a circumstantial evidence case of proving guilt beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with innocence. *See Sanders v. State*, 286 So.2d 825, 828 (Miss. 1973). The jury was properly instructed as to this burden of proof in Instruction D-12.

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give prosecution the benefit of all favorable inferences that

may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*McFee v. State*, 511 So.2d 130, 133-34 (Miss. 1987) (citing *Gavin v. State*, 473 So.2d 952, 956 (Miss.1985); *May v. State*, 460 So.2d 778, 781 (Miss.1984)). Sufficient evidence existed for the jury to find that the prosecution had met its burden of proof in this case. We do not reverse based upon this assignment of error.

## XXV.

## THE PROSECUTION COMMITTED REVERSIBLE ERROR AT SENTENCING BY COMMENTING ON LESTER'S FAILURE TO TESTIFY.

¶140. Assistant District Attorney Speetjens made the following comments during closing argument in the sentencing phase of Lester's trial:

> Through no Defense witness did we hear anything about what it's like when this Defendant is alone with this child.
>
> . . . .[Objection overruled]. . . .
>
> But not one of those people ever dealt with this Defendant when he had the child alone. The only thing that we know about what happened with this Defendant when he's alone with this child we must learn through doctors because when he's alone with this child she gets hurt, and she gets hurt very badly. What could possibly be worse?
>
> . . . .[No objection]. . . .

During closing argument, Mr. Peters commented on Lester's lack of remorse and failure to take the stand in the sentencing phase to express anger over Shadai's death. Lester argues on appeal to this Court that these statements by the prosecutors during closing argument in the sentencing phase of his trial were improper comments on his failure to testify, thus violating his privilege against self-incrimination. No objection was raised to any of these comments at trial, other than the first statement by Ms. Speetjens. Therefore, other than that first comment, Lester is barred from raising this issue on appeal. *See Carr*, 655 So.2d at 853.

¶141. Lester points to a similar case out of Texas in which the court rejected the argument that because the defendant testified during the guilt phase the prosecutor could comment on the defendant's failure to testify and express remorse during the sentencing phase. *Owen v. State*, 656 S.W.2d 458, 458-60 (Tex. Crim. App. 1983). However, Lester cites no Mississippi authority in support of his contention. Because Lester did testify during the guilt phase and all testimony from the guilt phase was admitted at the sentencing phase, it became proper for the prosecution to comment on Lester's guilt phase testimony during the sentencing phase.

## XXVI.

## INSTRUCTIONS DEFINING "HEINOUS, ATROCIOUS OR CRUEL" WERE UNCONSTITUTIONALLY VAGUE.

¶**142.** Lester next complains that the instruction given by the trial court on the "heinous, atrocious or cruel" (HAC) aggravating circumstance was unconstitutionally vague. However, this Court recently held that this exact narrowing instruction on the HAC aggravator satisfied constitutional requirements in *Carr*, 655 So.2d at 851-52. *See also Conner v. State*, 632 So.2d 1239, 1269-71 (Miss. 1993) (finding same HAC instruction to be constitutional); *Jenkins v. State*, 607 So.2d 1171, 1181-82 (Miss. 1992) (with same holding on same instruction). We do not reverse based upon an argument so well-settled by this Court to be unpersuasive.

## XXVII.

## THE HAC AGGRAVATOR IS ALSO UNCONSTITUTIONAL AS APPLIED TO LESTER.

¶143. Lester also argues that the HAC aggravating circumstance instruction was not warranted by the evidence in his case. A large portion of the expert testimony in this case was devoted to describing the torturous pain to which Shadai was subjected as a result of her injuries. Dr. Galvez testified as to the excruciating pain which would have resulted from Shadai's abdominal injuries, describing it as a "very painful, lancinating pain, like a stabbing." He further testified that Shadai's head injuries would have caused her to have grogginess with a severe headache and terror. Testimony was also offered by Dr. Donaldson that excruciating pain would have accompanied the spiral fracture in Shadai's femur. This was a conscienceless, pitiless crime which caused unnecessary torture to Shadai through a high degree of pain. The HAC aggravating circumstance instruction was appropriately given in this case, so this issue is meritless.

## XXVIII.

## THE TRIAL COURT'S ANTI-SYMPATHY INSTRUCTION COUPLED WITH THE DENIAL OF A MERCY INSTRUCTION MEAN THAT LESTER'S SENTENCE MUST BE REVERSED.

¶144. Lester's next assignment of error cites failure by the trial court to give a mercy instruction as being reversible error. However, it is well settled that a criminal defendant is not entitled to a mercy instruction, and that the issuance of a mercy instruction is within the discretion of the circuit court. *Jackson v. State*, 672 So.2d 468, 494 (Miss. 1996) (citing *Foster v. State*, 639 So.2d 1263, 1301 (Miss.1994); *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss.1992); *Hansen v. State*, 592 So.2d 114, 150 (Miss.1991)). The United States Supreme Court has held that giving an antisympathy instruction does not violate any constitutional requirements, and that, in fact, a mercy instruction could induce a trial jury to base its sentencing decision upon whim or caprice instead of upon the evidence presented at trial. *Saffle v. Parks*, 494 U.S. 484, 492-95 (1990). Clearly this issue is without merit, and we do not reverse based upon Lester's twenty-eighth assignment of error.

## XXIX.

**THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT LESTER WAS REQUIRED TO PROVE THAT THE MITIGATING CIRCUMSTANCES OUTWEIGHED THE AGGRAVATING IN ORDER TO RECEIVE A LIFE SENTENCE.**

**¶145.** Lester contends that Instruction SS-1, given as Sentencing Instruction 15 erroneously instructed the jury that Lester had the burden of proving that the mitigating circumstances outweighed the aggravating circumstance. The relevant part of this instruction read:

> Next, to return the death penalty, you must find that the mitigating circumstances - those which tend to warrant the less severe penalty, life imprisonment - do not outweigh the aggravating circumstances - those which tend to warrant the death penalty.

¶146. As previously discussed, this argument is worthless. First, the plain language of § 99-19-101 (the statute governing the weighing process of the sentencing phase) requires the jury to find that the mitigating circumstances outweigh the aggravating circumstances before sentencing a defendant to death. Miss. Code Ann. § 99-19-101. Second, this Court has previously rejected the argument that a shift in the burden of proof occurs from the requirement that the jury find mitigating factors are not outweighed by aggravating factors. *Mack*, 650 So.2d at 1330. Finally this Court has recently approved this same instruction in *Doss v. State*, No. 93-DP-00509, slip at 26-27 (05-23-1996). *See also Conner v. State*, 632 So.2d 1239, 1278 (Miss. 1993). As a result, this issue is completely unpersuasive.

## XXX.

### THE COURT ERRED IN GIVING INSTRUCTION SS-1.

**¶147.** Lester claims that Instruction SS-1, given as Sentencing Instruction 15, was flawed because it failed to require the jury to make specific written findings of mitigating circumstances. At trial, the defense attorney stated that he had no objection to Section C of Instruction SS-1, the section to which Lester now points as being erroneous. Since Lester failed to object to this instruction at trial, he is now procedurally barred from raising this issue on appeal. *See Carr*, 655 So.2d at 853. Furthermore, this Court has previously held that the law in Mississippi does not require the jury to provide a written list of the mitigating circumstances which they find. *Foster*, 639 So.2d at 1302-1303. This issue is both procedurally barred and without merit.

## XXXI.

### THE TRIAL COURT ERRED IN DENYING LESTER'S REQUEST FOR AN INSTRUCTION ON THE STATUTORY MITIGATING FACTOR OF EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

¶148. Lester complains that he was denied his statutory right to have the jury instructed on statutory mitigating circumstances when the trial court refused to instruct the jury to consider Lester's "extreme mental or emotional disturbance" under Miss. Code Ann. § 99-19-101(6)(b). He claims that the evidence presented of his alcohol use and stress supported the use of this instruction. In support of his argument Lester cites the statute; *Keys v. State*, 635 So.2d 845, 849 (Miss. 1994); and *Penry v. Lynaugh*, 492 U.2. 302 (1989). This Court in *Keys* stated that trial courts are precluded from

giving instructions that prevent the defendant from asserting a claim of self-defense. The United States Supreme Court reversed in *Penry*, because the jury instructions failed to provide a vehicle for consideration of the defendant's retardation and abuse as a mitigating factor, where these factors were likely to be considered both aggravating and mitigating.

¶149. In this case there was no evidence presented to show extreme mental or emotional disturbance, so refusal of the instruction was warranted by § 99-19-101. Additionally, refusing to give the "extreme mental or emotional disturbance" jury instruction did not foreclose the jury's consideration of Lester's mental capacity because a "catch-all" instruction was submitted to the jury. Lester therefore had the right to argue this mitigating circumstance before the jury under the catch-all instruction. A catchall instruction is sufficient to encompass non-statutory mitigating factors. *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990); *Jackson v. State*, 672 So.2d 468, 493 (Miss. 1996); *Taylor v. State*, 672 So.2d 1246, 1276-77 (Miss. 1996). Lester's claim that the jury was unconstitutionally foreclosed from considering all mitigating circumstances has no merit.

## XXXII.

## THE TRIAL COURT SIMILARLY ERRED IN DENYING LESTER'S REQUEST TO INSTRUCT THAT THE JURY COULD CONSIDER HIS LACK OF SIGNIFICANT CRIMINAL HISTORY AS MITIGATION.

¶**150.** Lester also cites as error the fact that the trial court refused to give a jury instruction on the statutory mitigating factor of "no significant history of prior criminal activity." Miss. Code Ann. § 99-19-101(6)(a). He argues that because the evidence showed that he had one prior felony conviction for grand larceny, the trial court should have instructed the jury to consider this mitigating factor. He points to *Carr v State*, 655 So.2d 824, 855-56 (Miss. 1995), as support for his argument. In *Carr*, this Court held that it was proper for the trial court to refuse a peremptory instruction on "no significant history of prior criminal activity" when that factor was in dispute. *Id*. at 856. Carr, like Lester, had on his record a prior felony conviction for grand larceny. *Id*. at 855. This Court held that whether the mitigating factor of "no significant history of prior criminal activity" existed was therefore a question for the jury and should not be precluded from consideration by the jury. *Id*. at 856. However, this Court concluded that it was not a proper peremptory instruction. *Id* at 856.

¶151. Based upon the ruling in *Carr*, it was proper for the trial court here to allow the jury to decide whether the mitigating factor of "no significant history of prior criminal activity" existed based upon the evidence that Lester had a prior felony conviction. As discussed above, the catchall instruction in Instruction SS-1 allowed the jury to consider this mitigating factor, if they found that it existed based upon the evidence presented. The evidence was inconclusive as to the existence of this mitigating factor, and the jury was not precluded from considering this factor. Therefore, the trial judge did not err in refusing to grant Lester's request for this instruction, and this issue is without merit.

## XXXIII.

## THE TRIAL JUDGE ERRED IN GIVING INSTRUCTION S-5 OVER LESTER'S OBJECTION.

¶**152.** Over objection by Lester, the trial court granted Instruction SS-5, which stated, "Just because

these instructions have listed certain mitigating circumstances you are allowed to consider, does not mean that those or any other mitigating circumstances exist. It is for only you, the jury, to determine which mitigating circumstances exist." Lester argues that this instruction was abstract, because it instructs the jury that the mitigating factor of "age of the defendant" given in Instruction SS-1 might not exist. He argues that the confusion created by this instruction warrants reversal of his sentence.

¶153. The obvious meaning of Instruction SS-5 was to instruct the jury that they must determine which factors shown by the evidence were in fact mitigating. The instruction is a correct statement of the law, because it is a question for the jury to decide which mitigating factors exist, as set out in Miss. Code Ann. § 99-19-101. Instruction SS-5 must be read together with the other jury instructions given to determine whether it is abstract and confusing. *Lee v. State*, 469 So.2d 1225, 1232 (Miss. 1985). Since Instruction SS-5 cannot be said to have mislead the jury when read in conjunction with Instruction SS-1 (the general instruction on determining and weighing mitigating and aggravating factors), the trial court's decision to grant it was not reversible error. *Id*. at 1232. *See also Pickett v. State*, 443 So.2d 796, 800 (Miss. 1983).

## XXXIV.

## THE TRIAL COURT ERRED IN GIVING INSTRUCTION S-3 WHICH ALLOWED THE JURY TO CONSIDER NON-STATUTORY AGGRAVATING CIRCUMSTANCES.

¶154. Lester objected to Instruction S-3 at trial, but on different grounds than those he raises on appeal. At trial he objected to the instruction on grounds that it incorrectly informed the jury on how they were supposed to weigh aggravating and mitigating circumstances. As a result, Lester is barred from raising this issue on appeal, because objection on one ground at trial waives all other grounds for objection on appeal. *See Conner*, 632 So.2d at 1255.

¶155. Aside from the procedural bar, Lester's argument is not convincing. Instruction S-3 read:

The Court instructs the jury that it must be emphasized that the procedure you must follow is not a mere counting process or a certain number of aggravating circumstances versus the number of mitigating circumstances, rather, you must apply your reason to judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death in light of the totality of the circumstances present.

Lester argues that this instruction invited the jury to consider non-statutory aggravating factors in violation of Miss. Code Ann. § 99-19-101 and Mississippi case law.

¶156. Lester is accurate in his statement that this Court has previously held that Miss. Code Ann. § 99-19-101 is clear in limiting the aggravating factors which a trial jury may consider to those specifically listed in subsection 5 of the statute. *See Balfour v. State*, 598 So.2d 731, 747-48 (Miss. 1992) (citing *Stringer v. State*, 500 So.2d 928, 941 (Miss. 1986) and *Coleman v. State*, 378 So.2d 640, 648 (Miss. 1979)). However, Instruction S-3 did not instruct the jury to consider other non-statutory aggravating factors. It merely informed the jury on the manner in which they were to evaluate those aggravating circumstances which they could consider under the statute. As discussed above, taking the instructions as a whole, the jury below was adequately informed that they must limit their consideration to the aggravating circumstances set out in Miss. Code Ann. § 99-19-101.

This issue is therefore without merit.

## XXXV.

## THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE.

¶157. Lester argues that the death penalty is disproportionate in his case, because the jury did not find that he intended to kill, because the jury only found one invalid aggravating circumstance (the HAC aggravator), and because the statutory scheme allowed the jury unfettered discretion to impose either the death penalty or convict of manslaughter. As previously discussed, Mississippi's statutory sentencing scheme provides sufficient safeguards against such unfettered discretion. Although the jury did not find that Lester intended to kill, they did find that Lester actually killed and that he contemplated that lethal force would be employed. Miss. Code Ann. § 99-19-101(7) only requires that one of these factors be found before imposing death; here the jury found two. Also, Miss. Code Ann. § 99-19-101 only requires that the jury determine that the mitigating circumstances don't outweigh the aggravating circumstances before imposing the death penalty. The statute does not set out a requisite number of aggravating circumstances which must be found before imposing death. As previously discussed, the HAC aggravator was not invalidly found by the jury in this case. Since the jury did make a finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstances in Lester's case, this requirement was met.

¶158. Lester also argues that Mississippi's proportionality review statute is unconstitutional, because it only requires comparing the defendant's case with other cases where death was imposed. Miss. Code Ann. § 99-19-105. Lester asserts that all cases in which the death penalty *could* be imposed should be considered, including those in which the death penalty is not actually imposed. Lester cites *Harris v. Blodgett*, 853 F.Supp. 1239, 1286-91 (W.D. Wash. 1994), and *State v. Marshall*, 613 A.2d 1059, 1070-74 (N.J. 1992), in support of his contention. In *Harris*, the court held that Washington's proportionality review statutory procedure violated the due process requirements of the federal Constitution, because the criminal defendant was not given notice of a specific definition of "similar cases," which would be compared to his case in determining whether the death penalty was proportionate in his case. *Harris*, 853 F.Supp. at 1291.

¶159. In *Marshall*, the New Jersey Supreme Court determined that their "universe of similar cases" for proportionality review would include all death-eligible cases. *Marshall*, 613 A.2d at 1070-74. However, the court noted that other states (including Georgia, Maryland, Delaware, and Pennsylvania) did not use the same definition of similar cases. *Id*. at 1073-74. Furthermore, the court stated, "Had it appeared to be an insurmountable task to examine all 'clearly death eligible cases,' we might have made a mid-course correction." *Id*. at 1074. Lester cites no controlling authority requiring this Court to change Mississippi's proportionality review. We hold that the current guidelines are sufficiently specific, and we find no reason to undertake the overwhelming task of considering all death eligible cases in our review. Lester's final assignment of error is also without merit.

## CONCLUSION

¶160. Most of the issues which Lester raises on appeal to this Court are procedurally barred and/or without merit. However, the unfair prejudicial effect resulting from the amendment to the indictment

on the second day of trial, the denial of a continuance after improper evidence of Shadai's sexual abuse was admitted, and the admission of irrelevant, improper testimony resulted in the deprivation of Lester's right to a fair trial. We reverse Lester's conviction of capital murder and sentence of death by lethal injection based upon Issues II, IV, VII, and X, and subparts E, F, and G of Issue VI. This case is remanded to the Hinds County Circuit Court for a new trial.

**¶161. REVERSED AND REMANDED TO THE CIRCUIT COURT OF HINDS COUNTY FOR A NEW TRIAL.**

**LEE, C.J., PRATHER, P.J., AND McRAE, J., CONCUR. PITTMAN, J., CONCURS IN RESULT ONLY. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION. MILLS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, ROBERTS AND SMITH, JJ.**

**BANKS, JUSTICE, CONCURRING:**

¶162. I concur with the result reached by the majority. I write separately to express my disagreement with some of the particulars of the opinion.

I.

¶163. The majority sanctions the use of the convictions of his siblings as impeachment evidence against Lester's father's testimony that he tried to raise his children as good citizens. I don't know that Percy, the defendant's father, claimed to have been successful at raising law-abiding children but I concede that his testimony could have left that inference. Nevertheless, it is my view that the evidence should have been excluded as more prejudicial than probative under Rule 403. Our decision today does not turn on this issue. Lester's claim of error in this regard is procedurally barred because there was no objection, and the error may not recur upon retrial however. I would leave it at that, rather than encourage the use of convictions against non-parties for their spill-over impeachment effect upon persons on trial.

II.

¶164. I feel similarly about the State's failure-to-report evidence used against Lester in relation to his own prior conviction. In my view it is a "detail" of the conviction. Indeed there would have been no adjudication of guilt, and no conviction had Lester reported in compliance with his probation. Thus this information showed how he came to be convicted, rather than that he was in fact convicted and what he was convicted of. Our law of impeachment limits evidence of criminal conviction to the fact of conviction. *White v. State,* 202 Miss. 246, 252-53, 30 So.2d 894 (Miss. 1947) (prosecution can inquire into the type and fact of previous convictions, but cannot inquire into the fact that defendant had withdrawn a guilty plea); *Powers v. State*, 156 Miss. 316, 320, 126 So. 12 (1930) (fact of conviction and the type of crime admissible, although not details of the crime). As such, the failure-to-report information is an impermissible detail and should not be admitted on remand.

III.

¶165. Once again I am compelled to write with reference to a **Batson** claim. The State used 67% of its challenges against blacks where the venire was 46% black. The resulting jury was 67% white. Without regard to the fact that the prosecutor here involved has in the past admitted a racial animus in peremptory strikes in capital cases[(2)], I would not agree that there is no prima facie case. *See, e.g.* **Mack v. State**, 650 So. 2d 1289, 1298 (Miss. 1994) (assessing **Batson** claim where prima facie case consisted of seated jury was 75% black and venire was 56% black, and prosecutor used 20% of its challenges); *see also* **Rousseau v. State**, 824 S.W. 2d 579 (Tex. Cr. App. 1992) (prima facie case established where state used 54% of strikes against blacks and Hispanics); **Commonwealth v. Hamilton**, 582 N.E. 2d 929 (prima facie case made where state's strikes eliminated 67% of black veniremen, 14% of whites).

¶166. Because we are remanding there is no need for us to make a call. The facts will be different. While I concede that there are other factors, including the fact that both defendant and victim are black, which tend to weaken the prima facie case, I do not agree that there is no prima facie case. The relative strength of the prima facie case may be taken into consideration in assessing the bona fides of the proffered reasons. *See Mack v. State*, 650 So. 2d 1289, 1298 (Miss. 1994).

IV.

¶167. Finally, instruction SS-5 may look harmless, but it reflects the continuing problem with the failure to instruct jurors that no unanimity is required in finding mitigating circumstances. We have consistently taken refuge in the fact that S-1 does not explicitly require unanimity, even to the point of finding no error in denying requested instructions on individual consideration. **Hansen v. State**, 592 So. 2d 114, 149 (Miss. 1991). **Hansen** did have a proffered defense instruction. In this case, SS-5 reinforces the suggestion that I find in S-1 that findings on mitigators must be unanimous. It tells the jury that no mitigator exists unless it "the jury" finds that it exists. Nowhere is the individual juror told that this is an individual decision. Consequently, I would order that this instruction not be used in its present form.

**MILLS**, JUSTICE, SPECIALLY CONCURRING:

¶168. I specially concur with the well reasoned opinion of the majority.

¶169. I agree with the majority that a trial court may not amend an indictment to change a charge to another crime, except by action of the grand jury, **Jones v. State**, 279 So. 2d 650, 651 (Miss. 1973), and that amendments to indictments must be of form and not substance. **Contreras v. State**, 445 So. 2d 543, 545 (Miss. 1984). In the instant case, the amended indictment expanded the time period of the charges against the defendant and most certainly affected his counsel's ability to defend him. This error was fatal to this case.

¶170. I do not share the views of the majority regarding the remaining issues which have been deemed reversible in this cause.

¶171. As to the issue of prior sexual abuse, it is my belief that this proof should have been admissible under the exceptions provided by Rule 404(b) of the Mississippi Rules of Evidence. The evidence in

this case establishes clearly that the murdered child, Shandai, had been sexually abused at least two to three weeks prior to her death. The proof is conclusive that Mr. Lester was the adult primarily responsible for her care during each day and that other bodily injury, such as the broken leg, occurred on his watch. Interestingly, his explanation of the broken leg and the later injuries causing her death was the same. We may paraphrase his testimony excusing his role in her broken leg and later death as follows: "I don't know what happened. I was in the shower both times." I would clarify the exception to Rule 404(b) to clearly allow introduction of such proof where the underlying offense charges sexual abuse of a minor child. This proof would have been admissible, in my view, under the original indictment, without need for amending the indictment. *Shelter v. State*, 445 So. 2d 844, 848 (Miss. 1984).

¶172. The evidence of the prior beating of the victim's mother by the defendant should likewise be admissible. Specifically, in this instance the same Dr. O'Brien gave his expert opinion in direct examination that:

> ...what I said was that the test results are not consistent with this individual being, falling in either of those categories, that is, either a child molester or violent person.

¶173. Clearly, the State possessed authority to put on proof of violent acts previously committed by Lester in order to rebut the defendant's expert witness who stated that Lester was not a violent person.

¶174. For these reasons, I specially concur in this case.

**PITTMAN, ROBERTS AND SMITH, JJ., JOIN THIS OPINION.**

1. Miss. Code Ann. § 97-3-27. was amended in 1994 to specifically exclude § 97-3-19(2)(f), as it excludes rape, burglary, arson, and robbery.

2. *See Kenneth Davis v. State*, 660 So. 2d 1228, 1262 citing *Edwards v. Thigpen*, 682 F.Supp. 1374, 1376 (S.D. Miss. 1987) (Banks, J., Concurring).